IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

DONALD LEE GILSON,                    )
                                      )
            Petitioner,               )
                                      )
vs.                                   )        Case No. CIV-01-1311-C
                                      )
MARTY SIRMONS, Warden, Oklahoma       )
      State Penitentiary,             )
                                      )
            Respondent.               )

## MEMORANDUM OPINION

Petitioner, a state prisoner currently facing execution of a sentence of death, appears

with counsel and petitions for a Writ of Habeas Corpus pursuant to 28 U.S.C.A. § 2254,

challenging his conviction in the District Court of Cleveland County, Case No. CF-96-245.

Respondent has responded to Petitioner's *Petition for a Writ of Habeas Corpus by a Person*

*in State Custody Pursuant to 28 U.S.C. § 2254* (hereinafter "Petition.")[1]  Petitioner has

replied to this response.  The state court record has been supplied.[2]

## I.  PROCEDURAL HISTORY

Petitioner was convicted by jury in the District Court of Cleveland County, State of

Oklahoma, Case No. CF-96-245, of one count of First Degree Murder for the death of Shane

---

[1] References to the parties' pleadings shall be as follows:  Petitioner's *Petition for a Writ of Habeas Corpus* shall be cited as (Pet. at __.); Respondent's *Response to Petition for Writ of Habeas Corpus* shall be cited as (Resp. at __.); Petitioner's *Reply* shall be cited as (Reply at __.);

[2] The trial court's original record shall be cited as (O.R. at __.).  The trial transcript shall be cited as (Tr., Vol. ___, p. __.).

Coffman.  Shane Coffman's death occurred on or about August 15, 1995.  (O.R. CF-96-245 at 1-2.)  In a related case involving the victim's siblings, Petitioner was convicted of two counts of Injury to a Minor Child, Case No. CF-96-256.  Finally, Petitioner was convicted of one count of Conspiracy to Unlawfully Remove a Dead Body and one count of Unlawful Removal of a Dead Body, in Case No. CF-96-247.

The jury recommended the imposition of a death sentence for First Degree Murder (O.R. CF-96-245 at 1022), finding the existence of two aggravating circumstances:  the murder was especially heinous, atrocious, or cruel; and the existence of a probability the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.  (O.R. CF-96-245 at 1021.)

Petitioner received the following sentences for the non-capital offenses:  life imprisonment and a five thousand ($5,000) fine for two counts of Injury to a Minor Child; ten (10) years' imprisonment and a five thousand dollar ($5,000) fine for Conspiracy to Remove a Dead Body; and five (5) years' imprisonment and a five thousand dollar ($5,000) fine for the Unlawful Removal of a Dead Body.

Petitioner appealed his convictions and his death sentence to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA").  The OCCA affirmed Petitioner's convictions and death sentence in a published opinion dated July 26, 2000.  Gilson v. Oklahoma, 2000 OK CR 14, 8 P.3d 883.  Petitioner's subsequent petition for writ of certiorari to the United States Supreme Court was denied on April 2, 2001.  Gilson v. Oklahoma, 532 U.S. 962 (2001).

Petitioner filed an Application for Post-Conviction Relief which was denied by the OCCA in an unpublished opinion dated September 1, 2000.  (Case No. PCD-2000-212.)

## II. FACTUAL BACKGROUND

Under 28 U.S.C. § 2254(e), when a federal district court addresses "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  For the purposes of consideration of the present Petition, the Court provides and relies upon the following synopsis from the OCCA's opinion summarizing the evidence presented at Petitioner's trial.  Following review of the record, trial transcripts, and the admitted exhibits, the Court finds this summary by the OCCA is adequate and accurate. The Court therefore adopts the following summary as its own.

On February 9, 1996, the skeletal remains of eight (8) year old Shane Coffman were found in an abandoned freezer located next to a mobile home formerly rented by his mother, Bertha Jean Coffman.  A subsequent search of the mobile home revealed a photograph of [Gilson].  On February 11, 1996, authorities from the Cleveland County Sheriff's Office met with [Gilson] at his mobile home.  Living in the mobile home with [Gilson] was Bertha Jean Coffman and her four children, twelve (12) year old Isaac, ten (10) year old Tia, eleven (11) year old Tranny and seven (7) year old Crystal.  The children were immediately removed from the trailer and taken to Children's Hospital in Oklahoma City.  [Gilson] and Bertha Jean Coffman were detained by the deputies.

Examinations of the children conducted in the emergency room revealed Tranny and Crystal were healthy with a few small scars on each. However, Isaac and Tia were malnourished and emaciated.  Tia's feet were swollen and she had difficulty walking.  She had gangrenous tissue on her right foot.  On her right buttocks was a large open ulcer.  Isaac was in the worst condition, emaciated and needing assistance to walk.  He was

malnourished and had several injuries, in various stages of healing, and scars throughout his body.

In their initial interview with police, [Gilson] and Coffman both denied any knowledge as to the manner in which Shane died. They stated he had run away from home during the early part of November and they had found him dead in the weeds near Coffman's trailer. They decided that putting him in the freezer would be the best thing to do. However, in subsequent interviews both [Gilson] and Coffman recanted this story and admitted to knowing more about the circumstances surrounding Shane's death. From interviews with [Gilson], Coffman, the Coffman children and other witnesses, the following picture emerged.

The four Coffman children mentioned above, along with the murder victim in this case, and another brother, thirteen (13) year old Jeremy, lived with their mother Bertha Jean Coffman, in a mobile home. During the fall of 1994, the Cleveland County Sheriff's Department received complaints of sexual abuse committed upon one of the Coffman children by Coffman's then boyfriend (not [Gilson]). The investigating detective visited Coffman's mobile home and found the conditions deplorable and unsanitary. The children were removed from Coffman's home until conditions improved. It was about this time that Bertha Jean Coffman met [Gilson]. They were both working as janitors at Little Axe Schools. [Gilson] fixed up Coffman's trailer so she could get her children back. The children were subsequently returned to their mother.

Thereafter, [Gilson] began spending more and more time with Coffman and was given the authority to discipline the children. In June of 1995, the oldest child, Jeremy, ran away. The next month, Coffman and her children walked to [Gilson]'s trailer for a visit and never returned to their home. Whatever possessions they had were left at Coffman's trailer. [Gilson]'s trailer had only 2 bedrooms; [Gilson] and Coffman slept in one room and the other room contained [Gilson]'s leather working material. As a result, all five children were forced to sleep on blankets in the living room. They were not permitted to go outside, but had to remain inside the trailer at all times. The children were taken out of school and claimed to be homeschooled by Coffman, although no evidence of homeschooling was ever found. The children were also not permitted to go to church.

[Gilson] and Coffman both disciplined the children. This discipline took several forms, including standing at the wall, sometimes for hours at a

4

time, and beatings with a bamboo stick, a belt, boards, wooden rulers, [a] metal ruler, and a bullwhip. The children were also made to sit in the bathtub, often for hours at a time. Food was withheld, particularly from Isaac and Tia, as punishment. The abuse inflicted upon Shane Coffman resulted in his death on August 17, 1995.

At trial, Tranny testified that he last saw his brother Shane sitting in the bathtub. Tranny said Shane had gotten in trouble for going to the bathroom on the living room carpet. He said that before Shane was put into the bathtub, [Gilson] beat him with a board. Tranny said Shane received several beatings with the board, all over his body. After the beating, [Gilson] put Shane into the bathtub. After a couple of hours, Shane was let out of the bathtub. He then got into trouble again. Tranny said [Gilson] and Coffman then took Shane outside the trailer. Tranny did not know what happened to Shane while he was outside, but he said he could hear Shane screaming. [Gilson] and Coffman carried Shane back inside the trailer. Tranny said Shane's arms were swollen, he was breathing "weird", and he had a soft spot on his head. Pursuant to [Gilson]'s "house rules", the other children were not permitted to talk to Shane. [Gilson] then carried Shane to the bathroom and placed him in the bathtub. Tranny said he and the other children heard a few more screams and banging noises. He said both [Gilson] and Coffman were with Shane when they heard the screams. The children then decided to try and go to sleep. He said they were awakened some time later by [Gilson] and Coffman and told that Shane had run away, and that [Gilson] and Coffman were going to look for him.

Isaac testified [Gilson] first sent Shane to stand at the wall for wetting the bed. While he was standing at the wall, [Gilson] hit him with a board. [Gilson] and Coffman eventually took Shane to the bathroom and put him in the bathtub. Isaac said [Gilson] made all the other children go to the bathroom and tell Shane what a bad boy he was. He said that both [Gilson] and Coffman remained in the bathroom with Shane while the children watched television. He said they could hear Shane crying. Isaac further stated that later that night, [Gilson] and Coffman told them Shane had run away.

In a statement made to police shortly after his arrest, and admitted at trial as State's Exhibit 2, [Gilson] stated that on August 17, 1995, he had put Shane in the bathtub as punishment. [Gilson] said he was trying to teach Shane a lesson, so he spanked him and put him in the bathtub where he was to remain until he stopped the disruptive behavior. He said the water in the bathtub was initially warm to help the pain from the spanking, but then he changed it to a

cold bath. [Gilson] said Shane was crying as Coffman talked to him about his behavior. He said he then laid down on the couch to watch television with the rest of the kids where he eventually fell asleep. Coffman was in and out of the bathroom talking to Shane before she went to the bedroom to lay down. A while later, Coffman came into the living room in tears and told [Gilson] to come to the bathroom. He said Coffman had taken Shane out of the bathtub and laid him on the floor. Shane's lips were blue and he was not breathing. [Gilson] said he performed CPR for approximately an hour to an hour and half. When his efforts were unsuccessful, [Gilson] took the comforter off of his bed, wrapped Shane up and placed him back in the bathtub.

[Gilson] said he and Coffman discussed what to do next. He said Coffman was worried that the Department of Human Services (hereinafter DHS) would take her kids away if the authorities found out Shane had died. So they left Shane in the bathtub, waiting until the other children had gone to sleep to remove him from the house. [Gilson] said they carried Shane outside and placed him in the back of a truck. He said they discussed "just dumping him somewhere" or "bury[ing] him out in the middle of the boonies." But they decided neither of those options were right and "even though he wasn't alive he would still be part of the family bein (sic) on her property, . . . thought about putting him in the freezer, it wouldn't hurt him and then concreting it over. And making a flower bed out of it." So [Gilson] and Coffman took Shane's body to the freezer located next to Coffman's trailer and put him inside. [Gilson] said he and Coffman told the other children Shane had run away.

Bertha Jean Coffman testified at trial to disciplining her children by making them stand at the time-out wall, and spanking them, only on their bottoms, with a cloth belt or a wooden paddle. She also testified that [Gilson] disciplined her children by spanking them with the wooden paddle, but at various places on their bodies. Coffman stated [Gilson] had a quick temper and did not want the children tearing up his trailer.

In her statement to police on August 17, 1995, Coffman said she and [Gilson] found Shane sexually assaulting his younger brother. As punishment, they made him stand at the time-out wall, then Coffman paddled him. When Shane refused to stand at the wall, Coffman spanked him again. When Shane still would not do as Coffman directed, she screamed at him. Shane then fainted. When Coffman could not get a response from Shane, she put a piece of ice on his chest. When he still did not respond, Coffman picked him up and took him to the bathroom where she placed him in a tub of cool water. She

said Shane eventually came to and wanted to get out of the tub. She said he slipped and hit his head on the faucet. Coffman stated she pushed on Shane's shoulders to keep him in the bathtub. They struggled, and the shower doors were knocked off their railing. Coffman called for [Gilson] to come and fix the doors. [Gilson] left the living room where he had been watching television with the other children and put the doors back on their railings. [Gilson] left the bathroom. Coffman and Shane struggled again. [Gilson] returned to the bathroom to see what the noise was about. He saw the doors had fallen off again so he took them and set them on the floor. Coffman said she remained in the bathroom with Shane while [Gilson] went back to the living room.

After a while, [Gilson] stepped into the bathroom and told Coffman to leave Shane alone for a while. So Coffman left the bathroom to get Shane dry clothes and prepare lunch. When she saw that [Gilson] had already prepared lunch, Coffman laid down on her bed. She was awakened by a noise in the bathroom and saw [Gilson] coming out of the bathroom. When asked how Shane was, [Gilson] responded he was fine and that he was blowing bubbles. Coffman sat down to have a cup of coffee, then decided to check on Shane. She found him quiet and not breathing. She called for [Gilson] and they pulled Shane out of the bathtub and gave him CPR. She said they waited until the other children were asleep before taking the body to the freezer. Coffman also stated that once Shane died, Isaac and Tia began receiving the brunt of the discipline from [Gilson].

Shane's skeletal remains were not found until approximately six (6) months after his death. Therefore, the medical examiner, Dr. Balding, was not able to make a determination as to the cause of death. The medical examiner did testify to injuries to certain bones which were evident upon his examination of the remains. The injuries included a fracture to the right jawbone. The injury was determined to be "acute" as it showed no signs of healing, and therefore was probably less than a week old at the time of death. Another fracture was also found on the left side of the skull. Dr. Balding testified the two fractures were the result of two different blunt force blows. A tooth was missing from the right jaw. Fractures were also found in the collarbone, shoulder blades, numerous ribs, both legs, and several vertebrae in the spine. All the fractures were ruled acute, and not the result of normal childhood play.

[Gilson] and Bertha Jean Coffman were jointly charged with first degree murder by child abuse in the death of Shane Coffman, and one count of injury to a minor child for the abuse suffered by each of the remaining

children.  They were also jointly charged with conspiracy to unlawfully remove a dead body and unlawful removal of a dead body.  On August 20, 1997, approximately eight (8) months prior to [Gilson]'s trial, Coffman entered *Alford*[3] pleas to all counts.  [Gilson] was subsequently tried and convicted on all charges except he was found not guilty of committing injury to a minor child as to Jeremy, Tranny, and Crystal.

Gilson, 2000 OK CR 14, ¶ 2-16, 8 P.3d at 895-898 (footnote added).

Additional facts and testimony were submitted to the jury at trial not contained herein or in the OCCA's summary.  Any additional facts necessary for a determination of Petitioner's claims will be set forth in detail throughout this Opinion where applicable.

## III. PETITIONER'S CLAIMS FOR RELIEF

### A. GENERAL CONSIDERATIONS:  Exhaustion and the Procedural Bar

Federal habeas corpus relief is not available to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition.  28 U.S.C. § 2254(b); Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994); see also Wainwright v. Sykes, 433 U.S. 72, 80-81 (1977).  In every habeas case, the court must first consider exhaustion.  Harris, 15 F.3d at 1554.  "States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights."  Coleman v. Thompson, 501 U.S. 722, 731 (1991).  Generally, a habeas petition containing both exhausted and unexhausted claims is deemed a mixed petition requiring dismissal.  Where it is clear, however, that a procedural bar would be applied by the state courts if the claim were now presented, the reviewing

---

[3] See North Carolina v. Alford, 400 U.S. 25 (1970) (provides for the entry of a plea of guilty while maintaining innocence).

habeas court can examine the claim under a procedural bar analysis instead of requiring exhaustion.  Coleman, 501 U.S. at 735 n.1 (citations omitted).

Habeas relief may also be denied if a state disposed of an issue on an adequate and independent state procedural ground.  Coleman at 750; see also Romero v. Tansy, 46 F.3d 1024, 1028 (10th Cir. 1995); Brecheen v. Reynolds, 41 F.3d 1343, 1353 (10th Cir. 1994). A state court's finding of procedural default is deemed "'independent if it is separate and distinct from federal law.'"  Id. (quoting Andrews v. Deland, 943 F.2d 1162, 1188 n.40 (10th Cir. 1991)); Ake v. Oklahoma, 470 U.S. 68, 75, 107 S.Ct. 1087, 84 L.Ed.2d 53 (1985); see also.  A state court's application of a procedural bar will be excused where a petitioner can show either:  1) cause for the default and resulting prejudice; or 2) that a fundamental miscarriage of justice would occur if the claims were not addressed in the federal habeas proceeding.  Coleman at 749-50.

## B.  THE STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), in order to obtain federal habeas relief once a state court has adjudicated a particular claim on the merits, Petitioner must demonstrate that the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1-2).

The Supreme Court defined "contrary to" as a state court decision that is "substantially different from the relevant precedent of this Court." Williams v. Taylor, 529 U.S. 362, 405 (2000) (O'Connor, J., concurring and delivering the opinion of the Court). A decision can be "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 406. The "unreasonable application" prong comes into play when "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

## C.   GROUNDS FOR RELIEF

### 1.   Ground 1:  Joinder of the Child Abuse Counts with the Child Abuse Murder Count.

In his first ground for relief, Petitioner alleges the joinder of five charges of child abuse with a charge of first degree murder based on the abuse of a child was highly prejudicial; that the evidence regarding the abuse charges would not have been admissible in his murder trial; and that he was, therefore, denied a fair trial under the Eighth and Fourteenth Amendments.  (Pet. at 9-12.)  Respondent responds that the OCCA properly determined joinder was permissible and that Petitioner has failed to demonstrate the OCCA's

10

determination was either contrary to, or an unreasonable application of, federal law, or was an unreasonable application of the facts in light of the evidence presented.  (Resp. at 6-15.)

In order to obtain federal habeas relief, Petitioner must establish not only that joinder of the offenses was improper, but also that the joinder violated his federal constitutional rights.  Lucero v. Kerby, 133 F.3d 1299, 1313 (10th Cir. 1998).  "[I]mproper joinder does not, in itself, violate the Constitution.  Rather, misjoinder . . . rise[s] to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his . . . right to a fair trial."  Id. at 1314 (quoting United States v. Lane, 474 U.S. 438, 446 n.8 (1986)).  To obtain habeas relief, Petitioner must show the joinder of offenses "'actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process.'"  Id. (quoting Tribbitt v. Wainwright, 540 F.2d 840, 841 (5th Cir. 1976); see also Herring v. Meachum, 11 F.3d 374, 377 (2d Cir. 1993)).

On appeal, the OCCA determined joinder was permitted pursuant to state statute if the separate offenses "'arise out of one criminal act or transaction, or are part of a series of criminal acts or transactions.'"  Gilson, 2000 OK CR 14, ¶ 46, 8 P.3d at 904 (quoting Glass v. Oklahoma, 1985 OK CR 65, ¶ 8, 701 P.2d 765, 768).  The OCCA found the abuse of Shane Coffman which resulted in his death occurred during the same time period as the abuse of the other children, and that the evidence supporting each count overlapped to show a common scheme or plan of repeated abuse.  The OCCA determined that joinder was permissible because the crimes occurred at the same location and that the victims and

witnesses were the same, demonstrating a logical relationship between the offenses.  <u>Id.</u> at 904-05.

Petitioner has not demonstrated that joinder of the offenses was improper.  He generally contends that the evidence of other abuse charges would not have been admissible in Petitioner's murder trial.  The OCCA determined that even had the charges been severed, "[e]vidence of the other offenses would have been permissible pursuant to 12 O.S. 1991, § 2404(B) to prove identity, common scheme or plan, and absence of mistake or accident." <u>Gilson</u>, 2000 OK CR 14, ¶ 50, 8 P.3d at 905.  Habeas relief is not available for errors of state law.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991).  A habeas court may not, as a general matter, revisit state court evidentiary rulings "unless the rulings in question rendered the trial so fundamentally unfair as to constitute a denial of federal constitutional rights."  <u>Moore v. Marr</u>, 254 F.3d 1235, 1246 (10th Cir. 2001) (quotation and citation omitted).

Even if joinder were improper, however, Petitioner must still demonstrate that the joinder of offenses rendered his trial fundamentally unfair:

> "[H]abeas petitioners challenging their state convictions under the general 'fairness' mandate of the due process clause bear an onerous burden.  Because of the significant procedural protection provided by direct review through the state system, we will not lightly conclude that state court proceedings were so arbitrary as to violate due process."

<u>Lucero</u>, 133 F.3d at 1314 (<u>quoting</u> <u>Herring v. Meachum</u>, 11 F.3d 374, 378 (2d Cir. 1993)).

Prejudice may result from joinder of offenses sufficient to render a trial fundamentally unfair:

The joinder of multiple offenses in a single trial may result in prejudice to a defendant because "the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged." The jury may also confuse or "cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find."

Lucero, 133 F.3d at 1314 (quoting Drew v. United States, 331 F.2d 85, 88 (D.C. Cir. 1964)).

Petitioner first asserts that the jury was allowed to use evidence of child abuse to infer a criminal disposition to support the conviction for first degree murder. He contends this was the only way the State could obtain a conviction, as the evidence supporting the charge of first degree murder was "weak." He asserts that evidence of abuse of the other children was the only evidence demonstrating the abuse of Shane Coffman "other than the less than credible testimony of Bertha Coffman." (Pet. at 12.) When considering the sufficiency of the evidence, a federal court "may neither weigh conflicting evidence nor consider the credibility of witnesses." United States v. Harrod, 981 F.2d 1171, 1174 (10th Cir. 1992).

In addition to her testimony of Petitioner's abuse of the other children, the jury heard Ms. Coffman also testify she had seen Petitioner hit Shane with a board on the top of his head, on Shane's legs, and on his chest. (Tr., Vol. VI, p. 1373.) She further testified that on the day of Shane's death, she had spanked Shane three times and placed him in the bathtub. When he tried to get up, he slipped and hit his head - giving him "a big knot on the top of his head on the right side of his eye." (Tr., Vol. VI, pp. 1363-69.) She later left Shane in the bathtub and went to lie down. When she was awakened by a noise in the bathtub, she got up and saw Petitioner coming out of the bathroom. He told her Shane was fine. She later went

into the bathroom and discovered Shane was no longer breathing.  (Tr., Vol. VI, pp. 1374-76.)

Shane's siblings testified at trial regarding abuse they received from Petitioner.  Some of the children, however, also testified of abuse inflicted on Shane the day he died:  Shane being beaten with a board and taken outside, brought back into the trailer house "breathing weird" and with a soft spot on his head (Tr., Vol. VIII, pp. 1720-22); Petitioner beating Shane "a lot," everywhere on his body (Tr., Vol. VIII, p. 1720); screams and noises from the bathroom while Petitioner and Ms. Coffman were both with Shane.  (Tr., Vol. VIII, p. 1724-25.)

The medical examiner was not able to make a determination of the cause of death from Shane Coffman's skeletal remains due to the fact they were not discovered until approximately six months after the boy's death and were badly decomposed.  He was able to testify, however, that from his examination he could state that certain injuries to the bones were "acute," i.e., less than a week old at the time of Shane's death, and the result of blunt force trauma:  fracture to the right jawbone; fracture on the left side of the skull; missing tooth from the right jaw; and fractures in the collarbone, shoulder blades, numerous ribs, both legs, and several vertebrae in the spine.

Ms. Coffman's testimony was not, as Petitioner alleges, the only testimony regarding Petitioner's abuse of Shane.  The other children testified as to the last time they had seen Shane and the events leading up to his death.  Although they testified about Petitioner's abuse of Shane, this testimony was not interwoven with testimony of their own abuse.

14

Petitioner alleges there was a great risk of jury confusion because the evidence of each of the crimes was not separate and distinct.  Review of the testimony of the children reveals a majority of their testimony involved Petitioner's abuse of them individually, with distinct and specific references to the events regarding Shane on the day he died.  Any overlap in testimony between the offenses contradicted any argument of mistake or accident.

Petitioner has failed to show prejudice so great as to render his trial fundamentally unfair.  He has also failed to demonstrate the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law, or that it was an unreasonable determination of the facts in light of the evidence presented.  Accordingly, Petitioner's first ground for relief is denied.

### 2.    Ground 2:  "Split Verdicts" on First Degree Murder.

In his second ground for relief, Petitioner claims the jury delivered a non-unanimous verdict - or "split verdict" - of first degree murder, denying him due process of law under the Sixth, Eighth, and Fourteenth Amendments to the Constitution.  (Pet. at 12-30; Reply at 4-6.) Respondent responds that the jury unanimously found Petitioner guilty of first degree murder and was divided only as to the underlying theory, and that the OCCA's determination denying Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law.  (Resp. at 16-21.)

Petitioner was charged with first degree child abuse murder, pursuant to 21 Okla. Stat.

§ 701.7(C), for the death of Shane Coffman, and charged with five counts of injury to a

minor child for the abuse of the other children.[4]   Title 21 Okla. Stat. § 701.7(C) states:

> C.   A person commits murder in the first degree when the death of a child results from the willful or malicious injuring, torturing, maiming or using of unreasonable force by said person or who shall willfully cause, procure or permit any of said acts to be done upon the child pursuant to Section 7115 of Title 10 of the Oklahoma Statutes.   It is sufficient for the crime of murder in the first degree that the person either willfully tortured or used unreasonable force upon the child or maliciously injured or maimed the child.

At Petitioner's trial, the jury was given the following instruction regarding the first

degree murder charge:

> VERDICT FORM
> We, the jury, empaneled and sworn in the above entitled cause, do upon our oaths, find as follows, to wit:  as to the crime of MURDER IN THE FIRST DEGREE,
> The defendant is:
> [ ]     GUILTY
> [ ]     NOT GUILTY
> FURTHER, we make the following finding of fact as to the basis for our verdict of guilty:
> [ ]     Unanimous as to INJURY TO A MINOR CHILD
> [ ]     Unanimous as to PERMITTING INJURY TO A MINOR CHILD
> [ ]     Divided as to the underlying theory.

(O.R. at 1016.)

---

[4]  Petitioner was also charged with one count of conspiracy to unlawfully remove a dead body and one count of unlawful removal of a dead body.  Neither of these counts are included in Petitioner's ground for relief.

The jury found Petitioner guilty of murder in the first degree, but their findings of fact were divided as to the underlying theory.[5]  The jury had been instructed that although their verdict must be unanimous as to guilt of the crime of murder in the first degree, they did not need to unanimously agree as to the theory upon which they arrived at the verdict.  (O.R. 954, Instruction No. 14.)

On appeal, the OCCA found that the evidence presented at trial demonstrated a *prima facie* case and that all of the elements of child abuse murder, either by committing child abuse or by permitting child abuse, were proven to support a verdict of guilt.  Gilson, 2000 OK CR 14, ¶ 35, 8 P.3d at 902.  The OCCA applied Schad v. Arizona, 501 U.S. 624 (1991), and determined that Petitioner's due process rights were not violated:

> Here, there was a single crime charged--first degree murder by child abuse. Whether or not it was committed through the commission of child abuse or through the permitting of child abuse goes to the factual basis of the crime. The jury verdict was unanimous that [Gilson] committed the crime.  Such a verdict satisfies due process.  See Plunkett v. State, 719 P.2d 834, 841 (Okl.Cr.), cert. denied, 479 U.S. 1019, 107 S.Ct. 675, 93 L.Ed.2d 725 (1986).

Gilson, 2000 OK CR 14, ¶ 38, 8 P.3d at 903.

In Schad, the petitioner had been charged with both premeditated murder and felony murder.  The Arizona statute under which the petitioner was charged defined first degree murder as murder which is deliberate or premeditated, or which was committed in the commission of or attempt to perpetrate a robbery.  The jury was instructed that all twelve of

---

[5]  In case number CF-96-256 (five counts of injury to a minor child), the verdict forms offered the same alternatives regarding guilt for the crime and for the findings of fact as the basis of the jury's verdict of guilty. (Case No. CF-96-256, O.R. at 683.)

them must agree on a verdict of either guilty or not guilty.  The petitioner claimed, as does Petitioner here, that his conviction as instructed did not require the jury to agree on one of the alternative theories.  The Supreme Court stated:

> We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict."  McKoy v. North Carolina, 494 U.S. 433, 449, 110 S.Ct. 1227, 1236-1237, 108 L.Ed.2d 369 (1990) (BLACKMUN, J., concurring) (footnotes omitted).

Schad, 501 U.S. at 631-32.

Petitioner's arguments alternate between child abuse murder as a different way of proving "intent" or "mens rea" of the first degree murder malice aforethought requirement (Pet. at 15-18), and characterizing the jury's choice between the actual commission of child abuse and permitting child abuse as a "factual and not a legal choice."  (Pet. at 18-19.) Initially it should be noted that child abuse murder in Oklahoma is a general intent crime. See Fairchild v. Oklahoma, 1999 OK CR 49, 998 P.2d 611; Malicoat v. Mullin, 426 F.3d 1241 (10th Cir. 2005), cert. denied, ___ U.S. ___, 126 S.Ct. 2356 (2006); Workman v. Mullin, 342 F.3d 1100 (10th Cir. 2003).  It is not, therefore, a different way of proving the specific intent, malice-aforethought requirement of first degree murder.  Regardless whether the methods of the child abuse murder statute, i.e., committing the abuse or permitting the abuse, are characterized as mens rea or actus reus, the difference is without distinction when considering jury unanimity on the elements of an offense:

18

> We see no reason, however, why the rule that the jury need not agree as to mere means of satisfying the *actus reus* element of an offense should not apply equally to alternative means of satisfying the element of *mens rea*.

Schad, 501 U.S. at 632.  The OCCA determined, however, that the verdict of guilt indicating the jury was divided as to the underlying theory was a disagreement as to the factual basis of the offense and the manner in which the crime was committed.  Gilson, 2000 OK CR 14, ¶ 37, 8 P.3d at 903.

Petitioner further argues that due process does not permit a "fractured" jury verdict because the jury must unanimously agree on the underlying facts, citing to Apprendi v. New Jersey, 530 U.S. 466 (2000), and that the government must establish guilt beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. In re Winship, 397 U.S. 358, 364 (1970); Fisher v. Gibson, 282 F.3d 1283 (10th Cir. 2002). Apprendi is not applicable, as it does not apply retroactively.  Spears v. Mullin, 343 F.3d 1215, 1236 (10th Cir. 2003).[6]  The OCCA found that all of the elements of each alternative theory of child abuse murder were proven by the State.

---

[6]    Apprendi held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490, 120 S.Ct. 2348.  Here, the State charged Spears and Powell with, and the jury found them guilty of, first-degree murder, after finding that the State proved that crime beyond a reasonable doubt.  Apprendi does not indicate in any way that it overrules Schad.

Spears, 343 F.3d at 1236, n.20..

19

Contrary to Petitioner's claims, the jury's division went to the factual basis of child abuse murder.  The OCCA analogized child abuse murder to felony murder and determined that it was to be interpreted in the same manner.  The OCCA held that "a constitutionally unanimous verdict is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged and not with respect to alternative means by which the crime was committed."  Gilson, 2000 OK CR 14, ¶ 40, 8 P.3d at 903.  The state court's holding is not contrary to the Supreme Court's directive in Schad:

> If a State's courts have determined that certain statutory alternatives are mere means of committing a single offense, rather than independent elements of the crime, we simply are not at liberty to ignore that determination and conclude that the alternatives are, in fact, independent elements under state law.  See Mullaney v. Wilbur, 421 U.S. 684, 690-691, 95 S.Ct. 1881, 1885-1886, 44 L.Ed.2d 508 (1975) (declining to reexamine the Maine Supreme Judicial Court's decision that, under Maine law, all intentional or criminally reckless killings are aspects of the single crime of felonious homicide); Murdock v. City of Memphis, 20 Wall. 590, 22 L.Ed. 429 (1875).

Schad, 501 U.S. at 636-37.

Due process requires that a statute not forbid conduct in terms so vague that people of common intelligence would come to differing guesses about its meaning.  Schad, 501 U.S. 632.  In the instant case, the jury's verdict was unanimous as to Petitioner's guilt of child abuse murder, but divided only between the alternative methods set forth in the statute. "Despite wishful thinking to the contrary, Schad is controlling," Spears, 343 F.3d at 1236, and the OCCA correctly applied Schad to Petitioner's claims.  Petitioner has failed to demonstrate the OCCA's determination to be contrary to, or an unreasonable application of,

clearly established federal law as determined by the Supreme Court.   Accordingly, Petitioner's second ground for relief is denied.

### 3.      Ground 3:  Petitioner's Death Sentence and the Requisite Intent to Kill.

In his third ground for relief, Petitioner contends the State failed to make the requisite determination of culpability required by the Eighth and Fourteenth Amendments before a sentence of death may be imposed.  Petitioner claims that because the jury did not return a unanimous verdict, the determination of culpability must be made both for permitting child abuse and for the actual commission of child abuse.  (Pet. at 30-38.)  As stated previously, the jury was unanimous in its verdict of guilt for child abuse murder, but disagreed in its factual finding as to under which of the two statutorily alternative methods Petitioner committed the offense.

In Enmund v. Florida, 458 U.S. 782 (1982), the defendant was convicted of first degree murder and robbery of two elderly persons and was sentenced to death.   The defendant, however, was merely the driver of the vehicle used to escape from the scene of the crime.  The defendant "did not kill or attempt to kill."  Enmund, 458 U.S. at 798.  The issue in Enmund was "whether death is a valid penalty under the Eighth and Fourteenth Amendments for one who neither took life, attempted to take life, nor intended to take life." Id. at 787.  The Enmund Court held that the imposition of the death penalty in that circumstance was inconsistent with the Eighth and Fourteenth Amendments.  Id. at 788.  In support of its decision, the Supreme Court stated:

> For purposes of imposing the death penalty, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt. Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts.

Id. at 801.

The Supreme Court in Enmund gave consideration to the states' imposition of the death penalty and the individual actions and requisite culpability of defendants. It found that in the vast majority of the states, the death penalty was deemed by most legislatures and juries to be unjustified where an individual aids and abets a felony in the course of which a murder is committed by others, but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force be used.[7] Id. at 797. The Supreme Court focused on Enmund's actions in determining the appropriateness of the death penalty:

> The focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims, for we insist on "individualized consideration as a constitutional requirement in imposing the death sentence," Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (footnote omitted), which means that we must focus on "relevant facets of the character and record of the individual offender." Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

Id. at 798.

The necessity of focusing on the actions of the defendant in order to impose the death penalty was further advanced by the Supreme Court in Cabana v. Bullock, 474 U.S. 376

---

[7] "It would be very different if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony." Enmund, 458 U.S. at 799.

(1986)[8].  In Cabana, the defendant was found guilty of first degree murder under a

Mississippi statute defining felony murder.  There, however, the defendant was found to have

had a much more active role in the death of the victim.  In that case, an argument took place

between the victim and another individual.  The defendant, Bullock, attempted to grab the

victim, followed the victim as he attempted to escape, and held the victim's head as the other

individual struck the victim with a whiskey bottle.  After the victim was killed by the other

individual, Bullock assisted in disposing of the body and kept the victim's car for himself.

Cabana, 474 U.S. at 379.

The Supreme Court, recognizing Enmund's holding, identified the issue to be decided

as "in whose hands the decision that a defendant possesses the requisite degree of culpability

properly lies."  Id. at 378.[9]  The Court stated:

> The Eighth Amendment is satisfied so long as the death penalty is not imposed
> upon a person ineligible under Enmund for such punishment.  If a person
> sentenced to death in fact killed, attempted to kill, or intended to kill, the
> Eighth Amendment itself is not violated by his or her execution regardless of
> who makes the determination of the requisite culpability; by the same token,
> if a person sentenced to death lacks the requisite culpability; the Eighth
> Amendment violation can be adequately remedied by any court that has the
> power to find the facts and vacate the sentence.

---

[8] Abrogated on other grounds by Pope v. Illinois, 481 U.S. 497 (1987).

[9] In its discussion of Enmund, the Court stated:

but our ruling in Enmund does not concern the guilt or innocence of the defendant
– it establishes no new elements of the crime of murder that must be found by the
jury.  Rather, as the Fifth Circuit itself has recognized, Enmund "does not affect the
state's definition of any substantive offense, even a capital offense."

Id. at 385 (citations omitted).

Id. at 386.

In Tison v. Arizona, 481 U.S. 137 (1987), the Supreme Court considered the issue of

"whether the Eighth Amendment prohibits the death penalty in the intermediate case of the

defendant whose participation is major and whose mental state is one of reckless indifference

to the value of human life."  Tison, 481 U.S. at 152.[10]  The Court held:

> We will not attempt to precisely delineate the particular types of conduct and
> states of mind warranting imposition of the death penalty here.  Rather, we
> simply hold that major participation in the felony committed, combined with
> reckless indifference to human life, is sufficient to satisfy the Enmund
> culpability requirement.

Id. at 158.[11]

---

[10]  The Court's usage of the phrase "intermediate case" refers to its determination that the facts of the case did not fall into either of the two categories of which Enmund addressed:

> Enmund explicitly dealt with two distinct subsets of all felony murders in
> assessing whether Enmund's sentence was disproportional under the Eighth
> Amendment.  At one pole was Enmund himself:  the minor actor in an armed
> robbery, not on the scene, who neither intended to kill nor was found to have had any
> culpable mental state.  Only a small minority of States even authorized the death
> penalty in such circumstances and even within those jurisdictions the death penalty
> was almost never exacted for such a crime.  The Court held that capital punishment
> was disproportional in these cases.  Enmund also clearly dealt with the other polar
> case:  the felony murderer who actually killed, attempted to kill, or intended to kill.
> The Court clearly held that the equally small minority of jurisdictions that limited the
> death penalty to these circumstances could continue to exact it in accordance with
> local law when the circumstances warranted.  The Tison brothers' cases fall into
> neither of these neat categories.

Tison, 481 U.S. at 149-50.

[11]  Discussing intent and culpability, the Court stated:

> This reckless indifference to the value of human life may be every bit as shocking
> to the moral sense as an "intent to kill."  Indeed it is for this very reason that the
> common law and modern criminal codes alike have classified behavior such as

In Hatch v. Oklahoma, 58 F.3d 1447 (10th Cir. 1995), overruled on other grounds by

Daniels v. United States, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001), the Tenth Circuit stated:

> On federal habeas review of a state court's disposition of this issue, however, our review is circumscribed:
>
> > [T]he court must examine the entire course of the state-court proceedings against the defendant in order to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made.  If it has, the finding must be presumed correct by virtue of 28 U.S.C. § 2254(d), and unless the habeas petitioner can bear the heavy burden of overcoming the presumption, the court is obliged to hold that the Eighth Amendment as interpreted in Enmund is not offended by the death sentence.
>
> Cabana, 474 U.S. at 387-88, 106 S.Ct. at 697-98 (footnote and citation omitted); see also Hopkinson [v. Shillinger, 866 F.2d 1185,] at 1215 [(10th Cir. 1989)] (quoting the same).

Hatch, 58 F.3d at 1470.[12]

---

occurred in this case along with intentional murders.  *See, e.g.*, G. Fletcher, Rethinking Criminal Law § 6.5, pp. 447-448 (1978) ("[I]n the common law, intentional killing is not the only basis for establishing the most egregious form of criminal homicide. . . .  For example, the Model Penal Code treats reckless killing, 'manifesting extreme indifference to the value of human life,' as equivalent to purposeful and knowing killing").

Id. at 157.

[12] Petitioner argues the Oklahoma courts did not make a determination or factual finding of culpability, and that this habeas proceeding should be stayed, allowing the OCCA to make such a determination. This Court is aware of Cabana's options regarding the factual inquiry: determination by the federal court or "sending back" for a state court determination.  Cabana's alternatives, however, are appropriate only when the state court has failed to make the factual determination.  As determined below, this Court is of the opinion the State has already conducted the factual inquiry and made a culpability assessment.  Requiring the state court to revisit this issue would not be appropriate.

The Supreme Court has restated that <u>Enmund</u> did not establish any new substantive elements of a capital crime, and that the necessary finding of culpability may be made at any stage of the proceedings, including during sentencing or on appeal. <u>See</u> <u>Hopkins v. Reeves</u>, 524 U.S. 88 (1998); <u>see also</u> <u>Cabana</u>, 474 U.S. at 392.

### a.    Commission of Child Abuse

On direct appeal, the OCCA acknowledged its prior holding that a defendant convicted of first degree murder by child abuse who actually killed the victim was eligible for the death sentence. <u>Gilson</u>, 2000 OK CR 14, ¶ 127, 8 P3d at 919. The state court then set out various facts and found the evidence in Petitioner's case supported a finding that he actually killed Shane Coffman and was eligible for the death sentence:

> Here, the evidence supports a finding that [Gilson] actually killed the victim. [Gilson] participated in beating the victim prior to the time he was taken to the bathroom. [Gilson] was in the bathroom with the victim and Coffman, and after Coffman left the room, was seen exiting the bathroom immediately before Shane was found dead. This evidence certainly renders [Gilson] eligible for the death sentence.

<u>Gilson</u>, 2000 OK CR 14, ¶ 127, 8 P.3d at 919.

The evidence in Petitioner's case supports the finding that he actually killed Shane Coffman. Petitioner's Eighth Amendment culpability determination for the imposition of the death penalty has, therefore, been satisfied. <u>Workman</u>, 342 F.3d at 1111-12; <u>Cabana</u>, 474 U.S. at 386 ("If a person sentenced to death in fact killed, . . . the Eighth Amendment itself is not violated by his or her execution.")

### b. Permitting Child Abuse.

The OCCA recognized that the verdict in Petitioner's case was a general verdict of guilt for first degree murder and that the jury disagreed as to the underlying factual basis. The court then stated that it had not previously ruled on whether a defendant convicted of child abuse murder by permitting child abuse was death eligible.  In a thorough and well-reasoned analysis,[13] the court reviewed the Enmund/Tison line of cases and found them to apply where a defendant did not actually kill the victim.  The court compared Tison to the underlying theory of permitting child abuse and stated:

> Here, the evidence shows [Gilson] was a major participant in the felony. Acting jointly with Coffman, he took Shane outside the trailer and was party to conduct which elicited screams from the child.  He and Coffman took Shane back inside the trailer, they both took him back to the bathroom and they both remained with him in the bathroom for periods of time.  This evidence clearly supports the conclusion that his participation was major and substantial.

Gilson, 2000 OK CR 14, ¶ 131, 8 P.3d at 920.

The OCCA next determined whether Petitioner displayed a reckless indifference to human life as required by Tison for the individualized determination of culpability.  The court found that the evidence demonstrated Petitioner acted with such reckless indifference and that he "subjectively appreciated that his conduct would likely result in the taking of innocent life."  Id. 2000 OK CR 14, ¶ 137, 8 P.3d at 921.  The court summarized:

> Accordingly, evidence in the present case of [Gilson's] full, active and knowing participation in the underlying acts of child abuse inflicted upon Shane, his failure to disassociate himself from those acts of abuse perpetrated

---

[13]  Gilson, 2000 OK CR 14, ¶¶ 128-151, 8 P.3d at 919-24.

by Bertha Coffman, and his failure to either be deterred in his conduct or respond in any positive manner to what surely must have been pleas for mercy from the victim, were sufficient for a reasonable juror to find beyond a reasonable doubt that he was a major participant in the child abuse and that he acted with reckless indifference to human life.

Id. 2000 OK CR 14, ¶ 142, 8 P.3d at 922.

From review of the entire record, it is apparent the OCCA made a factual determination and assessment of the culpability of the Petitioner under both underlying theories of child abuse first degree murder. This Court is bound by the presumption of correctness of the state court's determination. 28 U.S.C. § 2254(e). Petitioner has not rebutted this presumption by clear and convincing evidence. The Eighth Amendment as interpreted by Enmund and Tison is not offended by Petitioner's death sentence. Petitioner has failed to demonstrate the OCCA's determination to be contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). Petitioner's third ground for relief is, therefore, denied.

### 4.   Ground 4:  Proportionality Between Sentence of Death and Crime of First Degree Murder by Permitting Child Abuse.

In his fourth ground for relief, Petitioner claims his sentence of death is disproportionate to the crime of first degree murder by permitting child abuse. He claims it is disproportionate because he was convicted of allowing Shane Coffman's mother to abuse her son, that the crime is one of omission or failing to act, and that Petitioner did not have a direct role in the death of the child.  (Pet. at 39-40.)

28

Petitioner cites to <u>Coker v. Georgia</u>, 433 U.S. 584 (1977), for the proposition that the death penalty is excessive retribution for permitting child abuse.  In <u>Coker</u>, the Supreme Court held that death is a disproportionate penalty for the rape of an adult woman.  <u>Id.</u> at 592. The distinction made by the Supreme Court in <u>Coker</u>, however, was that rape, no matter how reprehensible and damaging, was not equal to the taking of a human life.  <u>Id.</u> at 598.

As stated previously, the Supreme Court has found the death penalty to be constitutionally permissible when a person did not himself actually kill but was engaged in a criminal activity and displayed a reckless indifference to human life:

> This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill. . . ."  [W]e hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

<u>Tison</u>, 481 U.S. at 157-58.

The OCCA found that the evidence of Petitioner's knowing participation in the acts of child abuse, his failure to disassociate himself from those acts of abuse, or respond in any positive manner "to what surely must have been pleas for mercy from the victim" were sufficient for a reasonable juror to find beyond a reasonable doubt that Petitioner was a major participant in the child abuse and acted with reckless indifference to human life.  <u>Gilson</u>, 2000 OK CR 14, ¶ 142, 8 P.3d at 922.  The OCCA then analyzed the constitutionality of the sentence to the crime under <u>Coker</u> and ultimately found the sentence to be constitutional:

Applying the death penalty to this situation wherein [Gilson], willfully, purposefully and knowingly allowed the victim to be abused to the extent that death resulted, when he was in a position to have prevented that abuse, certainly serves both the deterrent and retributive purposes of the death penalty. The threat that the death penalty will be imposed for permitting child abuse which results in the death of the child accentuates the responsibility a parent or person charged with the care and protection of a child has to that child and will deter one who permits that abuse.

As for retribution, [Gilson]'s personal culpability in this situation is high. The situation is quite different from that where the child abuse occurs and the individual is not aware of the abuse. [Gilson]'s responsibility for the death of the victim was not so attenuated as was that of Enmund who merely waited in the car while the victims were shot and had no knowledge of or immediate control over the actions of his co-defendants. [Gilson]'s personal participation in permitting Coffman to abuse the victim to the extent that death resulted was major and substantial, and there was proof that such participation was wilful and knowing. Therefore the death penalty is not excessive retribution for his crime.

Id. 2000 OK CR 14, ¶ 149-150, 8 P.3d at 923-24.

In order to obtain habeas relief, Petitioner must demonstrate that the state court's determination was contrary to, or an unreasonable application of, clearly established federal law, or that the determination was an unreasonable application of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1) and (2). This Petitioner has failed to do. Accordingly, Petitioner's fourth ground for relief is denied.

**5.      Ground 5:  Child Abuse Murder Statute and Ex Post Facto Clause.**

In his fifth ground for relief, Petitioner claims his conviction was based on the retroactive application of the child abuse first degree murder statute in violation of the ex post facto clause of the United States Constitution. He contends the application of the amended statute violated ex post facto protections in three ways:  (1) the elements of the

30

statute regarding duty were diminished by the Oklahoma Legislature and lessened the State's burden of proving that required element; (2) the statutory definition of "permit," utilized in the jury instructions, was added between the time of Shane Coffman's death and the time of Petitioner's trial; and (3) the newly-enacted statute regarding duty deprived Petitioner of a defense. (Pet. at 40-49.)

Respondent responds that the OCCA's determination was neither contrary to, nor an unreasonable application of, clearly established federal law, and that "although the statute under which the Petitioner was convicted has been amended numerous times, the required acts, the required proof and the possible punishment have consistently remained the same." (Resp. at 37.) In his Reply, Petitioner added that the amendments subjected him to a sentence of death where previously he was subject to life imprisonment.

On appeal, the OCCA extensively detailed and considered Petitioner's claims. Although lengthy, the Court considers the OCCA's accounting of each claim necessary to include in this Opinion, both to assist in explaining Petitioner's habeas claims and to more completely and accurately set forth the OCCA's determination:

> In his third assignment of error, [Gilson] contends his right to be free from *ex post facto* laws was violated as the jury was instructed on the elements of child abuse and child abuse murder which were not the law at the time of the offense. The prohibition against *ex post facto* law requires the finding of two elements: first, that the law was enacted subsequent to the conduct to which it was being applied; and second, that it must disadvantage the offender affected by it. Allen v. State, 821 P.2d 371, 375-76 (Okl. Cr. 1991).

> In the present case, [Gilson] was charged with causing the death of Shane on or about August 17, 1995. [Gilson] was also charged with abusing the other Coffman children between July 1995 and February 9, 1996. Prior to

31

November 1995, the first degree murder by child abuse statute, 21 O.S. 1991, § 701.7(C) referred to 21 O.S. 1991, § 843, for its definition of child abuse. Under § 843, the elements of Permitting Child Abuse were:  1) knowingly, 2) permitting, 3) injury or use of unreasonable force, 4) upon a child under the age of 18, and 5) *by one under a legal duty to render aid to the child.*  Johnson v. State, 751 P.2d 1094, 1096 (Okl. Cr. 1988).

In November 1995, § 843 was renumbered as 10 O.S. Supp. 1995, § 7115.  In 1996, § 7115 was amended and the definition of "permitting" was added to the statute.  The elements of "permitting" child abuse are:  1) *a person responsible for a child's health or welfare*; 2) knowingly; 3) permitted; 4) injury/torture/maiming/(use of unreasonable force); 5) upon a child under the age of eighteen.  OUJI-CR (2d) 4-37.  The instructions given to the jury in this case referred to permitting and persons responsible for the child's health or welfare and were consistent with OUJI-CR (2d) 4-37.

In the first of his three challenges to the above stated law and instructions, [Gilson] argues the jury was improperly instructed under § 7115, a law that was enacted after the death of the victim and after many of the alleged acts of abuse were committed against the other Coffman children.  He contends some of the prosecution's case implied he injured the children prior to November 1, 1995.  As stated previously, [Gilson]'s acts of child abuse were one continuous transaction; therefore, while there may have been some evidence of abuse inflicted by [Gilson] prior to November 1, 1995, most of the acts occurred after November 1995, and therefore it was not error to apply § 7115 to [Gilson]'s case.  Further, evidence showed that certain injuries to Tia and Isaac were, at the time of discovery in February 1996, relatively recent. That abuse certainly occurred after the enactment of 21 O.S. Supp. 1995, § 7115.

[Gilson] next argues applying the element of *a person responsible for a child's health or welfare* contained in the 1996 amendment to § 7115 violated *ex post facto* principles as that element lowered the State's burden of proof.  He asserts that at trial the prosecution merely had to show he was a person responsible for the children's health and welfare, a lesser burden than proving he had a legal duty to render aid as set forth in § 843.

The jury in this case was instructed in part as follows:

No person may be convicted of permitting the beating or injuring of a child unless the State has proved beyond a

reasonable doubt each element of the crime.  These elements are:  FIRST, a person responsible for a child's health or welfare; SECOND, knowingly; THIRD, permitted; FOURTH, injury, torture, or use of unreasonable force; FIFTH, upon a child under the age of eighteen.

OUJI-CR (2d) 4-37.[14]  The list of definitions given to the jury included the following:

> Person responsible for a child's welfare–includes a parent, legal guardian, custodian, foster parent, a person eighteen years of age or older with whom the child's parent cohabitates or any other adult residing in the home of the child.

This language is consistent with 21 O.S. Supp. 1992, § 845(B)(4) renumbered as 10 O.S. Supp. 1995, § 7102(B)(4).  *See also* OUJI-CR (2d) 4-39.

Under the renumbered 21 O.S.1991, § 843, the element of "*by one under a legal duty to render aid to the child*" was defined in the uniform jury instructions as follows:

> A person is under a legal duty to render aid to a child if [a statute imposes a duty to render aid to the child] [a (parent-child) (husband-wife) relationship exists between that person and the child] [a contractual duty to render aid to the child has been assumed by that person] [that person has voluntarily assumed the care of the child].

OUJI-CR (1st) 424.

---

[14]  Petitioner's requested jury instruction stated:

No person may be convicted of permitting the injuring of a child unless the State has proved beyond a reasonable doubt each element of the crime.  These elements are:

| | |
|---|---|
| FIRST, | a person responsible for a child's health or welfare; |
| SECOND, | knowingly; |
| THIRD, | permitted; |
| FOURTH, | injury; |
| FIFTH, | upon a child under the age of eighteen. |

(O.R. 891).

Under 21 O.S. 1991, § 843, in order to prove a legal duty to render aid, the prosecution had to prove a relationship between the defendant and the victim, either parent-child, husband-wife or a contractual duty to render aid to the child has been assumed by that person or that the defendant had voluntarily assumed the care of the child.  Under 10 O.S. Supp.1995, § 7115, in order to support a finding that the defendant was responsible for the child's welfare, the prosecution had to prove a certain relationship between the defendant and the child, either that of parent, legal guardian, custodian, foster parent, a person eighteen years of age or older with whom the child's parent cohabitates or any other adult residing in the home of the child.  Proving any of the alternatives in § 7115 is not any lesser of a burden than proving the minimum requirement under § 843 that the defendant had voluntarily assumed the care of the child.

Further, the evidence in this case clearly showed [Gilson] had a parent-child relationship with the children.  [Gilson] stated he shared equal responsibility with Coffman in disciplining and parenting the children.  He said he and Coffman wanted to be a family and provide the children with two parents.  In statements concerning his disciplining of the children, he often stated "that's part of being parents."  Coffman also stated she had given [Gilson] authority to discipline the children and that she, the children and [Gilson] were all trying to be a family.  Under this evidence, the State proved the parent-child relationship as set forth in both §§ 843 and 7115.  Any differences in the definitions of by one under a legal duty to render aid to the child and person responsible for a child's welfare did not disadvantage [Gilson], deprive him of an available defense, nor change the facts necessary to establish guilt.  Therefore, no *ex post facto* violation occurred.

[Gilson] next argues the inclusion of the definition of "permit" lessened the State's burden of proof.  Prior to November 1, 1996, the term "permit" as used in 21 O.S.1991, § 843, and 10 O.S.Supp.1995, § 7115, was not defined by either this Court or the Legislature.  In the 1996 amendment to § 7115, the Legislature defined "permit" as follows:

> "[P]ermit" means to authorize or allow for the care of a child by an individual when the person authorizing or allowing such care knows or reasonably should know that the child will be placed at risk of abuse as proscribed by this section.

10 O.S.Supp.1996, § 7115.

This definition was given to the jury in Instruction No. 12. [Gilson] argues that giving this instruction was an *ex post facto* violation as the term did not exist at the time of Shane's death or during the abuse of the other children. [Gilson] is correct that the definition of "permit" was not included in the statute until after the crimes in this case were committed. However, the use of the term in this case did not disadvantage [Gilson] or lessen the State's burden of proof.

Under both §§ 843 and 7115, the State has to prove the element of permitting. The definition of "permit" included in § 7115 merely reflected the common usage of the term. *Webster's* Dictionary defines "permit", in part, as:

1) To consent to:  allow.  2) to give permission to or for: authorize.  3) to afford opportunity to:  allow.

*Webster's II, New Riverside University Dictionary, pg.* 875-6. In specifically defining the term, the burden on the State was actually increased as it was required to prove the additional element that [Gilson] authorized or allowed the abuse to occur. [Gilson] did not suffer any disadvantage by the application of the term "permit" as defined in the jury instructions.

Further, [Gilson] argues that applying § 7115 to his case deprived him of an available defense. He contends that had the jury been instructed under the legal duty to render aid element of § 843, a defense that he did not intend to take control of parenting the Coffman children to the exclusion of their mother, would have completely defeated a conviction. He asserts that substituting "person responsible for a child's health or welfare" removed that defense.[15]

---

[15] Petitioner's requested jury instruction regarding first degree child abuse murder, set forth below in pertinent part, included the now objected to phrase and was identical to the trial court's jury instruction (O.R. 946) given in this case:

No person may be convicted of Murder in The First Degree unless the State has proved beyond a reasonable doubt each element of the crime.  These elements are:

* * *

OR

FIRST:      The death of a child under the age of eighteen;

SECOND:   The death resulted from the willful or malicious injuring, torturing, maiming, or using of unreasonable force;

A defense that [Gilson] did not have a legal duty to render aid would not have been a viable defense under the evidence in this case. By [Gilson]'s own statements, he admitted to parenting and disciplining the children. Those admissions essentially deprived [Gilson] of any defense that he did not intend to take control of parenting the children to the exclusion of Bertha Coffman. Accordingly, applying § 7115 to [Gilson]'s case did not deprive him of an available defense.

Although the trial court instructed the jury on certain definitions which were not in effect at the time of the crime, such definitions did not violate any *ex post facto* prohibitions as they neither inflicted a greater punishment than the law annexed to the crime when committed, altered any rules of evidence nor in any way disadvantaged [Gilson]. Therefore, this assignment of error is denied.

Gilson, 2000 OK CR 14, ¶¶ 97-111, 8 P.3d at 914-17.

As both Petitioner and Respondent note, the Supreme Court has identified and

explained an ex post facto violation as:

The Clause provides simply that "[n]o State shall . . . pass any . . . ex post facto Law." Art. I, § 10, cl. 1. The most well-known and oft-repeated explanation of the scope of the Clause's protection was given by Justice Chase, who long ago identified, in dictum, four types of laws to which the Clause extends:

"1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order

---

THIRD:        Which was willfully permitted;
FOURTH:       *By a person responsible for the child's health or welfare.*

(O.R. 888) (emphasis added).

> to convict the offender." Calder v. Bull, 3 Dall. 386, 390, 1
> L.Ed. 648 (1798) (*seriatim* opinion of Chase, J.) (emphasis
> deleted).

Rogers v. Tennessee, 532 U.S. 451, 456 (2001).

"[T]o fall within the *ex post facto* prohibition, two critical elements must be present: first, the law 'must be retrospective, that is, it must apply to events occurring before its enactment'; and second, 'it must disadvantage the offender affected by it.'" Miller v. Florida, 482 U.S. 423, 430 (1987) (quoting Weaver v. Graham, 450 U.S. 24, 29 (1981)). "We have also held in Dobbert v. Florida, that no *ex post facto* violation occurs if a change does not alter 'substantial personal rights,' but merely changes 'modes of procedure which do not affect matters of substance.'" Miller, 482 U.S. at 430 (quoting Dobbert v. Florida, 432 U.S. 282, 293 (1977)). "[N]o *ex post facto* violation occurs if the change in the law is merely procedural and does 'not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt.'" Miller, 482 U.S. at 433 (quoting Hopt v. Utah, 110 U.S. 574, 590 (1884)).

Petitioner contends that at the time of Shane's death the State had to prove he had a duty to protect Shane, but that at the time of trial the State needed to prove only that Petitioner was "a person eighteen years of age of older with whom the child's parent cohabitates or any other adult residing in the house of the child." Petitioner claims this change diminished the elements of the crime of first degree child abuse murder. (Pet. at 43.)

The OCCA determined, under the previous statute, that in order to prove duty the State had to prove a relationship between the defendant and the victim. Such relationships

necessary to prove a duty were a parent-child relationship, a contractual duty to render aid to the child, or that the defendant had voluntarily assumed care of the child.  At trial, in order to support a finding that Petitioner was responsible for Shane's welfare, the statute required the State to prove certain relationships, either that of a parent, legal guardian, custodian, foster parent, a person eighteen years of age or older with whom the child's parent cohabitates, or any other adult residing in the home of the child.  "The interpretation of a state law by the highest court of the state is generally binding on a federal court 'unless such interpretation is inconsistent with the fundamentals of liberty and justice.'" Chavez v. Baker, 399 F.2d 943, 943 (10th Cir. 1968) (per curiam), quoting Newman v. Rodriguez, 375 F.2d 712, 713 (10th Cir. 1967); accord, Salazar v. Rodriguez, 371 F.2d 726 (10th Cir. 1967); Pearce v. Cox, 354 F.2d 884 (10th Cir. 1965); Silva v. Cox, 351 F.2d 61 (10th Cir. 1965).

Petitioner claims the OCCA determined, "based on no evidence," that there was a parent-child relationship.  Contrary to Petitioner's assertions, review of the OCCA's opinion reveals that the OCCA referenced and utilized in its determination statements made by Petitioner of his equal parenting responsibilities with Bertha Coffman, and that both he and Bertha Coffman had stated they were trying to be a family.  The OCCA determined from these statements and the evidence in the case that the State had proven the parent-child relationship under both statutes, and that any difference in the statutes did not lessen the State's burden of proof, deprive Petitioner of an available defense, or change the facts necessary to establish guilt.  Petitioner has failed to demonstrate that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal

law.  As the OCCA's determination carefully demonstrates, the changes in the statutes did not increase Petitioner's punishment, change the ingredients of the offense, or change the ultimate facts necessary to establish guilt.  Miller, 482 U.S. at 433; 28 U.S.C. § 2254(d).

Petitioner next argues he was disadvantaged by a definition of the word "permit" adopted by the State Legislature before his trial but after Shane Coffman's death and the abuse of the other children.  The OCCA agreed the definition of "permit" was not included in the statutes until after the crimes in the case were committed, but found that under both statutes the State had the burden of proving the element of permitting.  The OCCA also determined that the newly added statutory definition was actually more onerous a burden on the State than the previous common usage of the term.  "In accordance with this original understanding, we have held that the Clause is aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" California Dep't of Corrections v. Morales, 514 U.S. 499, 504-05 (1995) (quoting Collins v. Youngblood, 497 U.S. 37, 43 (1990) (citing Calder v. Bull, 3 U.S. (Dall.) 386, 391-392, 1 L.Ed. 648 1798) (opinion of Chase, J.)); Beazell v. Ohio, 269 U.S. 167, 169-170 (1925)).  The statutory definition of permit was not determined by the OCCA to be more onerous on Petitioner than the prior law, a necessary requirement in order to be found ex post facto.  Dobbert, 432 U.S. at 294.  Petitioner offers no support for his contention that the inclusion of the added statutory definition of "permit" lessened the State's burden, and has failed to demonstrate the OCCA's determination to be contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

Nor was the OCCA unreasonable in its determination that the change in definition did not deprive Petitioner of a defense.  Petitioner claims he would have been able to argue he had no duty to provide aid because he did not intend to parent Shane.  As the OCCA noted, the evidence did not support this defense.  Petitioner made various statements regarding his intentions to establish a family and to have a parental relationship with the children.  These statements were supported by the testimony of Bertha Coffman, and other evidence presented at trial regarding living arrangements, financial support, and the discipline/punishment of the children.  Further, although not dispositive of the issue, Petitioner's claim of a diminished defense is somewhat diluted by the fact that his own requested jury instructions mirrored those actually given by the court at trial.  Petitioner has failed to meet his burden under 28 U.S.C. § 2254(d)(1) and (2).

Lastly, Petitioner claims the statutes which violate the ex post facto prohibition are 21 Okla. Stat. § 843 and the later version of 10 Okla. Stat. § 7115.  He contends these two statutes define permitting child abuse and the punishment allowed for this crime, and that before 1997, "permitting" child abuse was only punishable by the maximum of life imprisonment.  Now, Petitioner asserts, by defining it as a felony and taking away the punishment language found prior to 1997, the crime has become a capital offense and is an ex post facto violation under the facts and circumstances of his case.

Petitioner has apparently raised this issue for the first time in his Reply.  Accordingly, Petitioner's claim is unexhausted and, most certainly, procedurally barred by the OCCA.  Petitioner has shown neither cause and prejudice for his default, nor that a fundamental

miscarriage of justice would occur if the claim was not addressed.  Instead of dismissing the Petition as a mixed petition, however, the Court exercises its discretion to proceed on the merits of the claim and deny relief.  28 U.S.C. § 2254(b)(2).

The crime of first degree child abuse murder has, for all times relevant to Petitioner's case, been set forth in 21 Okla. Stat. § 701.7(C).  At the time of Shane Coffman's death, the statute defined first degree child abuse murder as:

> C.  A person commits murder in the first degree when the death of a child results from the willful or malicious injuring, torturing, maiming or using of unreasonable force by said person or who shall willfully cause, procure or *permit* any of said acts to be done upon the child pursuant to Section 843 of this title.

21 Okla. Stat. § 701.7(C) (emphasis added).  The statute does make reference to 21 Okla. Stat. § 843, and later to 10 Okla. Stat. § 7115, both of which set forth applicable fines and punishments for child abuse in addition to pertinent definitions.  Section 701.7(C) is, however, one of the statutorily enumerated crimes of first degree murder.  The punishments for first degree murder are set forth in 21 Okla. Stat. § 701.9:

> § 701.9. Punishment for murder
>
> A.  A person who is convicted of or pleads guilty or nolo contendere to murder in the first degree shall be punished by death, by imprisonment for life without parole or by imprisonment for life.

Altering or amending the definitions of child abuse and its possible fines and punishment did not increase the punishment for first degree murder, and more specifically, for first degree child abuse murder.  Petitioner's claim is without merit.

Petitioner has failed to demonstrate the OCCA's determination was either contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Additionally, Petitioner's claim regarding an increased sentence violating his ex post facto protection is without merit. Accordingly, for the reasons stated above, Petitioner's fifth ground for relief is denied.

### 6.      Ground 6:  Lesser Included Offenses.

In his sixth ground for relief, Petitioner contends the jury was not given the option of finding him guilty of the lesser included offenses of second degree depraved mind murder or of second degree manslaughter, in violation of the Eighth and Fourteenth Amendments, and contrary to Beck v. Alabama, 447 U.S. 625 (1980). (Pet. at 49-58.)

The Due Process Clause of the Fourteenth Amendment ensures that "a sentence of death [may not] . . . be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." Beck, 447 U.S. at 627. Due process does not require the jury to be instructed on every non-capital lesser-included offense supported by the evidence. Schad, 501 at 646. However, a jury may not be placed in "an all-or-nothing" position when the evidence supports a third option. Id. Whether one offense is a lesser-included offense of another criminal act is a question of state law. See Hopkins v. Reeves, 524 U.S. 88, 96-98 & n.6 (1998); Darks v. Mullin, 327 F.3d 1001, 1008 (10th Cir. 2003).

### a.        Second Degree Depraved Mind Murder

In Oklahoma, the elements of first degree murder by child abuse are:  (1) the death of a child under the age of eighteen years of age; (2) the death resulted from the willful or malicious injuring, torturing, or using of unreasonable force; (3) by the defendant and/or another engaged with the defendant.[16]  See 21 Okla. Stat. § 701.7(C); Gilson, 2000 OK CR 14, ¶ 78, 8 P.3d at 910.  Oklahoma has held that first degree murder by child abuse is a general intent crime.  Fairchild v. Oklahoma, 1999 OK CR 49, ¶ 28, 998 P.2d 611, 619.  The Tenth Circuit has considered first degree murder by child abuse under Oklahoma law and concluded that a jury need not find the defendant intended to kill the child, but rather that the crime is a type of felony murder.  See Workman, 342 F.3d at 1110.

The elements of second degree depraved mind murder in Oklahoma are:

(1) [the] death of a human; (2) caused by conduct which was imminently dangerous to another person; (3) the conduct was that of the defendant; (4) *the conduct evinced a depraved mind in extreme disregard of human life*; (5) the conduct is not done with the intention of taking the life of any particular individual.

Willingham v. Oklahoma, 1997 OK CR 62, ¶ 24, 947 P.2d 1074, 1081 (emphasis added), overruled on other grounds by Shrum v. Oklahoma, 1999 OK CR 41, 991 P.2d 1032.  "The fourth element– the extreme disregard of human life–actually places a higher burden on the

---

[16]   These elements were given to Petitioner's jury in Instruction No. 6 (O.R. at 946.) Alternatively, the instruction also set out the elements of first degree murder by child abuse by knowingly permitting the abuse by a person responsible for the child's health or welfare.

prosecution than does the general intent element of first-degree murder by child abuse, which only requires the intent to commit the act of abuse." Malicoat, 426 F.3d at 1253.

Petitioner claims the OCCA determined there are no lesser included offenses to child abuse murder and cites to an unpublished opinion of the OCCA to argue that this determination is contrary to the State's own case law and to his due process rights. The OCCA did not preclude second degree depraved mind murder and second degree manslaughter as lesser included offenses of child abuse murder. In Petitioner's case, the OCCA analyzed the evidence presented in his trial under the applicable standard[17] and concluded that the evidence did not support a finding that the lesser offense was committed while the greater offense was not. Gilson at 917. The OCCA determined that Petitioner had not shown that first degree child abuse murder had not been committed, as one of the elements was the death of a child and that Shane Coffman was "clearly a child." The court then found the evidence did not support an instruction on second degree depraved mind murder:

> Further, [Gilson] was not entitled to an instruction on second degree depraved mind murder as he has failed to show that under the evidence presented at trial, a rational jury would acquit him of first degree murder and find him guilty of the lesser offense of second degree murder. [Gilson] is entitled to an instruction on second degree murder only if the evidence at trial would allow a jury to rationally conclude that his conduct was not done with the intention of taking the life of an individual. 21 O.S.1991, § 701.8(1).

---

[17] "In determining the sufficiency of the evidence to support a lesser offense we look at whether the evidence might allow a jury to acquit the defendant of the greater offense and convict him of the lesser. See Hogan v. Gibson, 197 F.3d 1297, 1305 (10th Cir. 1999), citing Beck v. Alabama, 447 U.S. 625, 636, 100 S.Ct. 2382, 2388, 65 L.Ed.2d 392 (1980)." Gilson, 2000 OK CR 14, ¶ 113, 8 P.3d at 917.

Here the evidence showed that [Gilson] either willfully and intentionally participated in the abuse of Shane or that he knowingly permitted Coffman to abuse Shane to the extent that death resulted. The Coffman children testified [Gilson] acted with Coffman in each instance of abuse inflicted on Shane the day he died. Coffman testified she disciplined Shane that day and that [Gilson] stayed in the other room, except for the two times he attended to the shower doors and the time she saw him exit the bathroom shortly before the victim was found not breathing. In his pre-trial statement, [Gilson] said all he did was spank Shane and put him in the bathtub. This evidence would lead a reasonable jury to conclude that either [Gilson] willfully and intentionally inflicted such abuse to the extent that Shane died as a result or that he did nothing at all. The evidence does not support a finding that [Gilson] merely acted with a depraved mind having no intention of taking the victim's life.

Gilson, 2000 OC CR 14, ¶ 116-117, 8 P.3d at 917-18.

Petitioner directs the Court to the unpublished opinion of the OCCA, Evans v. State of Oklahoma, Case No. F-97-1215, for the contention that second degree murder and second degree manslaughter are lesser included offenses of child abuse murder.[18] Petitioner also cites to this unpublished opinion in support of his contention that his due process rights were violated when the OCCA determined in his case that the non-capital offenses were not lesser offenses to child abuse murder. As explained previously, the OCCA did not specifically state in Petitioner's case that there were no lesser included offenses to child abuse murder. Instead, the OCCA found, among other things, that the evidence was insufficient to acquit him of first degree murder and support a finding of guilt on the lesser offenses. This finding

---

[18] As Respondent identifies, an unpublished opinion is not binding on the OCCA, but may be cited and brought to that court's attention if no published case would serve as well for the purpose. Rule 3.5 (C)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2003).

differ's from the OCCA's determination in <u>Evans</u>, where the State did not request a rehearing on the issue and the court left its original holding in full force and effect that the lesser offenses in Evans' trial were supported by the evidence presented.  <u>Id.</u> at 5.

As set forth by <u>Beck</u>, Petitioner is not entitled to a lesser offense not supported by the evidence.  Petitioner does not identify what evidence existed which would show he acted with a depraved mind and that would demonstrate the OCCA's determination to be unreasonable other than to state he did not intend to abuse Shane but to punish him (Pet. at 57) and that "[s]panking Shane does not prove a willfulness to kill."  (Reply at 14.)

In <u>Malicoat v. Mullin</u>, 426 F.3d 1241 (10th Cir. 2005), the petitioner also made a claim of entitlement to lesser included offense instructions of second degree depraved mind murder in his trial for first degree child abuse murder.  He asserted that the evidence of his fatigue, stress, and past abuse were sufficient to entitle him to an instruction on the lesser offense.  The Tenth Circuit first recognized that Oklahoma has determined first degree child abuse murder to be a general intent crime, and then held that the evidence Mr. Malicoat was asserting in support of a lesser included instruction did not tend to negate the element of the first degree child abuse murder charge.  The Court determined the petitioner was not entitled to the lesser instruction as the evidence did not support the inference that he lacked the general intent to assault.  <u>Id.</u> at 1253-54.

In the instant case, the OCCA also found the evidence did not negate the element of first degree child abuse murder and determined the evidence insufficient to support an instruction on second degree depraved mind murder.  Petitioner has failed to demonstrate the

46

OCCA's determination to be contrary to, or an unreasonable application of, clearly established federal law, or to be an unreasonable determination of the facts in light of the evidence presented at trial.

<u>Second Degree Manslaughter Instructions</u>

Petitioner also asserts he was entitled to an instruction on second degree manslaughter. The trial court determined the evidence did not support submitting Petitioner's proposed instruction to the jury:

> If you have a reasonable doubt of the defendant's guilt on the charges of Murder in the First Degree and Murder in the Second Degree, you must then consider the charge of Second Degree Manslaughter.
>
> The elements of Second Degree Manslaughter are:
>
> **FIRST**,        the death of a human;
> **SECOND**,   the death was unlawful;
> **THIRD**,       the death was caused by the culpable negligence of the defendant.
>
> You are further instructed that the term "culpable negligence["] refers to the omission to do something which a reasonably careful person would do, or the lack of the usual ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions.

(O.R. at 894-95.)

On direct appeal, the OCCA determined the evidence to be insufficient and denied Petitioner's claim:

> As for the offense of second degree manslaughter, to warrant such an instruction evidence must be presented at trial showing the defendant's culpable negligence. <u>Revilla v. State</u>, 877 P.2d 1143, 1149-50 (Okl.Cr.1994), <u>cert. denied</u>, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995).  The

47

evidence here did not show a degree of carelessness amounting to a culpable disregard of the rights and safety of others to warrant an instruction on second degree manslaughter. See id., 877 P.2d at 1149-50. Evidence of [Gilson]'s active participation in the abuse of the victim would not lead a rational jury to acquit him of first degree murder and convict him of second degree manslaughter.

Gilson, 2000 OK CR 14, ¶ 118, 8 P.3d at 918.

The OCCA further determined that Petitioner was not entitled to lesser included instructions because he proclaimed his innocence and that his defense, when compared to the evidence presented at trial, did not lend any support to his claims:

Further, this Court has held that a defendant is not entitled to instructions on any lesser included offense when he defends against the charge by proclaiming his innocence. Hooker v. State, 887 P.2d 1351, 1361 (Okl.Cr.1994), cert. denied, 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995); Snow v. State, 876 P.2d 291, 297 (Okl.Cr.1994), cert. denied, 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995). [Gilson]'s defense was that he did not commit nor did he know of any abuse to any of the children. He claimed he was asleep on the sofa while Coffman was in the bathroom with Shane. He confessed that his only bad act was hiding the body and lying about Shane's death. Here, the evidence showed either [Gilson]'s wilful and malicious infliction of or his permitting the infliction of child abuse or it showed he knew nothing about the abuse. Therefore, instructions on second degree murder and second degree manslaughter were not warranted. Accordingly, the trial court did not abuse its discretion in denying the requested instructions. This assignment of error is denied.

Id., 2000 OK CR 14, ¶ 119, 8 P.3d at 918.

In Mitchell v. Gibson, 262 F.3d 1036 (10th Cir. 2001), the petitioner argued he was entitled to lesser included offense instructions of first degree manslaughter and second degree murder because his trial testimony and/or taped interview could support a finding that he did not intend to kill the victim. At trial, the petitioner denied any part of the crime. The Tenth

48

Circuit held that the evidence did not support lesser included offense instructions because, if the jury believed Mr. Mitchell took no part in the crime, his lack of participation would require a verdict of innocence rather than a conviction of homicide without an intent to kill. Id. at 1051.

This same rationale was applied by the OCCA:  either Petitioner did not commit any abuse or did not know of any abuse to Shane Coffman, in which case he would be entitled to a verdict of not guilty to child abuse murder, or the evidence of his active participation in the abuse of Shane Coffman would preclude a finding of a depraved mind or culpable negligence necessary to require submission to the jury of lesser included offense instructions. Petitioner has failed to demonstrate the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law, or that it was an unreasonable determination of the facts in light of the evidence presented at trial.  Accordingly, Petitioner's sixth ground for relief is denied.

### 7.   Ground 7:  Testimony of Children at Trial.

In his seventh ground for relief, Petitioner claims that allowing the five Coffman children to testify was improper as they were not competent to testify, did not testify from their own personal knowledge, and had admitted a willingness to lie under oath.  He contends the admission of the testimony of each child rendered his trial unreliable and highly prejudicial, depriving him of a fair trial and a reliable sentencing determination as guaranteed by the 8th and 14th Amendments.  (Pet. at 59-63.)

Prior to trial, a hearing was conducted regarding the children's competence to testify.

Dr. Wanda Draper testified *in camera* as to her observations of the children and her opinion

of each child's competency and ability to testify truthfully. (Tr., Vol. IV, pp. 841-95.) The

trial court reserved its ruling on each child's competence to testify until it conducted

individual *voir dire* examinations. The trial court stated it would consider the expressed

opinions of Dr. Draper in its analysis of the children's competency based upon their voir dire

questioning and responses. (Tr., Vol. IV, pp. 894-95.) Prior to any in-court testimony by the

children, the trial court held *in camera* hearings with each child. (Tr., Vol. VII, pp. 1485-

1537.) The trial court found as to each and all of the children:

> THE COURT: Well, I am going to find that at least for now that under
> 2601, 2602 they're competent to testify. These children have in this in-camera
> proceeding indicated to this Court that they have some personal knowledge of
> the facts and circumstances of these charges; that they understand the
> importance of telling the truth, and they understand what it means to take an
> oath under 2602 and 2603.

(Tr., Vol. VII, pp. 1540-41.)

During trial, each child testified and was subjected to extensive cross-examination by

the defense regarding their personal knowledge of the facts and circumstances, whether or

not they had ever lied, and to variations in their testimony and previous statements. (Tr., Vol.

VII, pp. 1544-1682; Vol. VIII, pp. 1696-1906.) On appeal, the OCCA denied Petitioner's

claim, finding that the trial court had not abused its discretion in ruling that the children were

competent:

> We find the record supports the trial court's ruling. Under 12 O.S.1991,
> § 2601, all persons are presumed competent to testify. A child is a competent

50

witness under 12 O.S.1991, § 2603, if he or she can distinguish truth from fiction, has taken an oath, and demonstrated that he or she has personal knowledge of the crime.  Hawkins v. State, 891 P.2d 586, 594 (Okl.Cr.1994), cert. denied, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995); Dunham v. State, 762 P.2d 969, 972 (Okl.Cr.1988).  Determination of a witness' competency to testify is a matter of discretion for the trial judge and that determination will not be disturbed unless the party asserting error shows a clear abuse of discretion.  Dunham, 762 P.2d at 972.

The record shows that each of the children indicated they could distinguish between the truth and a lie.  Each child indicated an understanding of what it meant to take an oath to tell the truth, and each child certainly demonstrated that he or she had personal knowledge of the facts of the case. [Gilson] makes much of the fact that the childrens' [sic] stories changed over time and that the children admitted they lied.  The record shows the childrens' [sic] statements varied in certain respects over time.  However, [Gilson] has failed to show this was the result of improper interview techniques or that it impacted one of the three factors listed in § 2603.  The children did admit that during their lifetimes they had in certain situations told lies, but they each testified they would not lie on the witness stand.  Regardless, any conflict or inconsistency in a witness' testimony goes to the weight and credibility of that testimony, not the competency of the witness to testify, and are issues properly addressed on cross-examination.   Gray v. State, 650 P.2d 880, 885 (Okl.Cr.1982).  Accordingly, we find the trial court did not abuse its discretion in ruling the children were competent to testify.

Gilson, 8 P.3d at 906-07.

The findings of the OCCA are based on factual determinations and matters of state evidentiary law.  Challenges to evidentiary rulings are claims of error under state law. "[S]tate procedural or trial errors do not present federal questions cognizable in a federal habeas corpus suit" unless Petitioner can "demonstrate[] state court errors which deprived him of fundamental rights guaranteed by the Constitution of the United States."  Brinlee v. Crisp, 608 F.2d 839, 843 (10th Cir. 1979).  Due process challenges to state evidentiary rulings are reviewed only for fundamental unfairness.  See Donnelly v. DeChristoforo, 416

51

U.S. 637, 642 (1974); <u>Hatch v. Oklahoma</u>, 58 F.3d 1447, 1468 (10th Cir. 1995) ("[I]n federal habeas proceedings, we do not question a state court's evidentiary rulings unless the petitioner can show that, as a whole, the court's rulings rendered his trial fundamentally unfair.").

Petitioner has not met his burden of "rebutting the presumption of correctness [of a factual issue made by a State court] by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Nor has he demonstrated that the testimony of the children rendered his trial fundamentally unfair. As determined by the OCCA, each of the children stated to the trial court *in camera* that they could distinguish between the truth and a lie, and that they would tell the truth and not lie in court. Petitioner has not demonstrated the state court's determination resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. Upon thorough review of the children's testimony, the *in camera* competency hearing, and the trial transcript, the Court concludes that the admission of the children's testimony did not render Petitioner's trial fundamentally unfair. Accordingly, Petitioner's seventh ground for relief is denied.[19]

---

[19] Petitioner also complains in a cursory fashion that he was not permitted to present an expert witness to discuss the competency or ability of the children to testify. This claim is raised more thoroughly and in more detail in Petitioner's eighth ground for relief, *infra*, and will be considered by the Court in its deliberation of that ground for relief.

### 8.    Ground 8:  Exclusion of Witnesses' Testimony.

In his eighth ground for relief, Petitioner complains that two crucial witnesses - one a rebuttal witness and the other a child psychology expert - were not permitted to testify, denying him of a fair trial in violation of the Sixth, Eighth and Fourteenth Amendments. (Pet. at 63-78.)  Respondent responds that exclusion of witnesses are evidentiary rulings which are matters of state law and not generally cognizable in federal habeas proceedings. Alternatively, Respondent responds that Petitioner has not demonstrated that the OCCA's determination was contrary to, or an unreasonable application of, federal law or was an unreasonable determination of the facts in light of the evidence presented.  (Resp. at 59-74.)

### a.    Exclusion of Attorney Deborah Maddox.

Subsequent to their arrest and the preliminary hearing, Petitioner and co-defendant Bertha Coffman entered into a joint defense agreement to defend together and pool their resources against the charges of first degree murder.   At the time of the joint defense agreement, Petitioner was represented by Deborah Maddox and Ms. Coffman was represented by Robert Perrine.  On July 24, 1997, after the preliminary hearing, but before trial, Ms. Coffman moved for a severance which was granted by the trial court.  Prior to her trial, Ms. Coffman entered a plea as to all of the charges against her.  The hearing was held without Petitioner or his counsel present.  Ms. Coffman testified at the hearing to provide the factual basis to accept the plea.  Ms. Coffman's sentencing was postponed until after she testified at Petitioner's trial.

Upon learning of the plea, Petitioner's counsel filed a motion to withdraw from representation of Petitioner due to a conflict of interest arising out of Ms. Coffman's decision to sever the trial and enter a plea.  In the motion, Petitioner's counsel set forth the facts regarding the joint defense agreement,[20] stating that counsel had filed all motions and hired all experts together, that the joint defense agreement had been explained to both defendants, and that they had participated in at least three strategy sessions/meetings with both attorneys. The motion also stated that Ms. Maddox had received privileged information from Ms. Coffman during numerous conversations, and that Ms. Coffman's pleas to the charges and details of the events were in direct opposition to her earlier confession.  In support of her motion to withdraw, Ms. Maddox stated the following:

> 10.   Now counsel for Gilson is compelled to withdraw from the representation of her client because of the obvious conflict of interest.  In fact, the only way to protect Donald Gilson is to withdraw from this case.  To do otherwise would mean that either counsel for Gilson would violate the "joint defense agreement" as to Coffman, or counsel for Gilson would violate her ethical duty to zealously represent her client by not pursuing a scathing cross-examination of the cooperating co-defendant.  Neither option is ethical under the Rules of Professional Conduct.  Specifically Rules 1.6, 1.7, and 1.9 of the **ABA Model Rules of Professional Conduct** would be egregiously violated, as would Rules [] of the **Oklahoma Code of Professional Responsibility**.

(O.R. at 657-58.)

---

[20] "The 'joint defense privilege' is an extension of the attorney client privilege and protects communications between an individual and an attorney for another when the communications are part of an on-going and joint effort to set up a common defense strategy.  Once this privilege is properly invoked, the privilege's scope is broad."  (O.R. at 653.)

During trial, defense counsel attempted to call Ms. Maddox in response to Ms. Coffman's trial testimony.  The State objected on the grounds of attorney-client privilege between Ms. Coffman and Ms. Maddox as a result of the joint defense agreement.  Ms. Coffman, through counsel, also asserted that she maintained the privilege to whatever extent it existed.  (Tr., Vol. IX, pp. 2059-60.)  The trial court held an *in camera* hearing and found that a joint defense agreement existed at least prior to the severance of the cases, and that Ms. Coffman did have an attorney-client privilege which could only be invoked by her.  The trial court determined that the issue was whether or not the information of which Ms. Maddox was privy was admissible in the prosecution of Petitioner.  Id.  In response to the trial court's inquiries regarding her possible testimony, Ms. Maddox agreed that the communications between her and Ms. Coffman were made in the course of the joint defense efforts and that the statements were designed to further that effort.  Ms. Maddox then responded that she was aware of the asserted privilege, but that she had conflicting ethical and moral concerns as she felt she had information from Ms. Coffman that could save Petitioner's life.  (Tr., Vol. IX, pp. 2064-65.)  The trial court determined Ms. Maddox's testimony to be impermissible, finding that the statements of Ms. Coffman were made in confidence during the joint defense efforts and had not been a voluntary waiver by her of the privilege.  The trial court found the information possessed by Ms. Maddox to be the type of confidential disclosure made in the course of a common defense plan that the privilege seeks to protect.  (Tr., Vol. IX, pp. 2068-69.)

On appeal, the OCCA first considered Petitioner's claim that Ms. Coffman, through her plea testimony and trial testimony, had waived the privilege.  The OCCA reviewed Petitioner's case law regarding implied waiver and determined the attorney-client privilege to have not been waived:

> An affirmative act as discussed in the cases cited by [Gilson] include filing suit, raising an ineffective assistance of counsel claim, or asserting a claim that put counsel's advice in issue.  None of these events occurred here. Coffman was called to testify as a witness for the State.  Her communications with Ms. Maddox were privileged. 12 O.S.1991, § 2502.  The record indicates the testimony sought from Ms. Maddox was evidence that had not been previously stated or testified to by Coffman.  Therefore, Coffman's act of testifying for the State concerning certain aspects of the crime did not waive the attorney-client privilege as to any other aspects of the crime.

Gilson, 2000 OK CR 14, ¶ 73, 8 P.3d at 909.

The OCCA then considered Petitioner's appellate claim that any valid privilege must give way to his due process rights, asserting that Ms. Coffman's interest was *de minimus* compared to his need to defend against the death penalty:

> "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. U.S., 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981) citing 8 J. Wigmore, Evidence § 2290 (McNaughton rev. 1961).  "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Id.  In situations where such a privilege could be abused, the privilege does not exist.  See 12 O.S.1991, § 2502(D)(1) (no privilege exists if the services of the attorney were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud); Rule 1.6(b), Oklahoma Rules of Professional Conduct, 5 O.S. 1991, Ch. 1 App. 3-A (lawyer may disclose intention of client to commit a crime).  No evidence of such abuse is present here.

Further, "the right to compulsory process does not negate traditional testimonial privileges such as the attorney-client privilege." Cooper v. State, 661 P.2d 905, 907 (Okl.Cr.1983), citing Washington v. State of Texas, 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019 n. 21 (1967). [Gilson] has failed to persuade us that his case presents such unique circumstances as to warrant limiting this well established privilege. The attorney-client privilege is not an arbitrary rule to be applied according to varying facts and circumstances. Here, the record shows [Gilson] was able to fully defend against the State's accusations. He extensively cross-examined Coffman on her version of events and any inconsistencies in her statements. There is no indication that Coffman committed perjury while testifying. Based upon this record, [Gilson] has failed to prove that Coffman's exercise of her attorney-client privilege deprived him of his rights to due process and confrontation of witnesses. Therefore, we find the trial court did not err in excluding the testimony of Ms. Maddox. This assignment of error is denied.

Gilson, 2000 OK CR 14, ¶ 75-76, 8 P.3d at 909-10.

28 U.S.C. § 2254 does not authorize a federal habeas court to review a state court's evidentiary rulings. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). A state court's evidentiary rulings "'may not be questioned in federal habeas proceedings unless they render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights.'" Valdez v. Winans, 738 F.2d 1087, 1089 (10th Cir. 1984) (quoting Brinlee v. Crisp, 608 F.2d at 850). A federal habeas court reviews only for violation of "the Constitution, laws, or treaties of the United States." Estelle, 502 U.S. at 68. State evidentiary determinations ordinarily do not present federal constitutional issues. See Crane v. Kentucky, 476 U.S. 683, 689 (1986). An exception exists, however, under some circumstances, if a state court applies the State's evidentiary rules unfairly to prevent a defendant from presenting evidence that is critical to his defense. Green v. Georgia, 442 U.S. 95, 97 (1979); Chambers v. Mississippi, 410 U.S. 284, 302 (1973); see also, e.g., Washington v. Texas, 388 U.S. 14, 16 (1967).

Chambers, and its line of cases, does not, however, create a constitutional entitlement to present any evidence critical to a criminal defendant's defense. See United States v. Scheffer, 523 U.S. 303, 308 (1998); Montana v. Egelhoff, 518 U.S. 37, 51-53 (1996). Rather, "the introduction of relevant evidence can be limited by the State for a 'valid' reason." Egelhoff, 518 U.S. at 53.

The central questions regarding an exception to the prohibition on habeas review of a state's determination of evidentiary issues are whether the evidence was critical to the defense and if the evidentiary rule was applied unfairly. A state court's determination is not unfair if the evidence was limited by the State for a valid reason. In Petitioner's case, there appears no real debate that the evidence sought to be introduced through Ms. Maddox was critical to Petitioner's defense. Instead, Petitioner's contention is that the State's reliance on the attorney-client privilege was an invalid use of a state evidentiary rule, asserting that Ms. Coffman had waived the privilege when she testified at trial and when she sent a letter to a third party.

"Under 28 U.S.C. § 2254(d), federal courts are required to apply a presumption of correctness to state court findings of fact." Valdez, 738 F.2d at 1089 (citing Sumner v. Mata, 455 U.S. 591 (1982), and Sumner v. Mata, 449 U.S. 539 (1981)). The OCCA determined Ms. Coffman had not waived her attorney-client privilege by testifying, and that her exercise of the privilege did not deprive Petitioner of his due process rights. In an effort to demonstrate the OCCA's determination was contrary to law and a violation of his due process rights, Petitioner outlines that Ms. Coffman had been informed twice by the

prosecution of her Fifth Amendment rights, and that with that knowledge she voluntarily testified.  Petitioner further states:

> Ms. Coffman asserted attorney client privilege after she testified on direct examination for the State, waiving her Fifth Amendment privilege.  Ms. Coffman's assertion of the privilege was to shield herself from impeachment on cross examination.  The jury only heard Ms. Coffman's one-sided version of events.

(Pet. at 70.)   Review of the record shows that Petitioner's outline of the proceedings is mistaken.  Ms. Coffman asserted her attorney-client privilege when Ms. Maddox was called by the defense to testify.  Although this was, as Petitioner states, "after she testified on direct examination for the State," it was also, more importantly, after she was subjected to a lengthy cross-examination by defense counsel.   During cross-examination, Ms. Coffman was questioned extensively not only about her testimony of the events on direct examination, but also to prior statements made by her to law enforcement and to the court.   Accordingly, her assertion of the attorney-client privilege could not have been to shield herself from impeachment on cross-examination.  The jury was exposed to more than what Petitioner claims was "Ms. Coffman's one-sided version of the events."[21]

Ms. Coffman testified to events she witnessed, not to conversations with Ms. Maddox during the joint-defense conferences.  Petitioner has not shown that the exercise of Ms. Coffman's attorney-client privilege and exclusion of Ms. Maddox's testimony rendered his

---

[21]   Ms. Coffman's cross-examination composes forty (40) pages of the trial transcript. Although she denied neglecting or abusing her children and killing Shane Coffman, she also stated that she never actually said Petitioner killed her son (Tr., Vol. VII, p. 1449) and that to her knowledge Petitioner did nothing during the week and a half before Shane Coffman died that could have caused his injuries. (Tr., Vol. VII, p. 1451.)

trial so fundamentally unfair as to deny him his constitutional rights.   As the OCCA determined, Petitioner was able to extensively cross-examine Ms. Coffman on her version of the events and inconsistencies in her statements.   Further, additional testimony and evidence incriminating Petitioner was presented through the children.   Petitioner has failed to demonstrate the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law, or that the state court's determination of facts was contrary to the evidence presented at trial.

### b.      Exclusion of Dr. Wanda Draper.

Petitioner also contends it was constitutional error for the trial court to exclude the testimony of Dr. Wanda Draper to challenge the reliability of the minor children's testimony. Petitioner characterizes Dr. Draper as an expert in psychology with a speciality in child development.   The trial court held that Dr. Draper did not meet the requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and determined that the issue of admissibility and reliability of the children's testimony would be a matter for the jury to determine.  (Tr., Vol. IV, pp. 893-95.)

On appeal, the OCCA reviewed Petitioner's claim under the Daubert and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), standards.   The OCCA determined upon review of the record that Dr. Draper's qualifications as an expert did not seem to be in doubt, but that the trial court appeared to have excluded her testimony based on her theory the children were not competent to testify, and not for any lack of qualifications.  Gilson, 2000 OK CR 14, ¶ 65, 8 P.3d at 907.  The OCCA ultimately determined:

60

Having thoroughly reviewed the record, we find the trial court did not abuse its discretion in excluding the testimony. Dr. Draper's testimony did not meet the <u>Daubert</u> requirements of "scientific knowledge" and the testimony would not have assisted the trier of fact. Once the trial court determined the children were competent witnesses, Dr. Draper's testimony would have been confusing and its speculative nature would not have been relevant to the jury's determination of the credibility of children's testimony. Accordingly, we find the testimony was properly excluded. This assignment of error is denied.

<u>Id.</u>, 2000 OK CR 14, ¶ 68, 8 p.3d at 908 (footnote omitted).

At the *in camera* hearing, defense counsel asked Dr. Draper if, based on all of her evaluations and information, she had an opinion whether the children were competent to testify about the relevant events of the case. Dr. Draper responded that it was her opinion that "in relationship to these circumstances and all the considerations that I have studied regarding these children, generally speaking I would question their competency." She based her opinion on there existing too great of a time span between the events and trial, and the many changes in the children's lives. (Tr., Vol. IV, p. 862-63.)

Petitioner asserts Respondent misunderstands the argument regarding Dr. Draper's testimony. He states that it appears Respondent believes Dr. Draper was being presented to challenge the ability of the children to testify. Petitioner now states that "Dr. Draper was being offered to help undermine the children's testimony without having to prejudice Mr. Gilson by the cross examination of small children before a jury." (Reply at 17.) Petitioner quotes from <u>Davis v. Alaska</u>, 415 U.S. 308, 318 (1974), stating that without Dr. Draper's testimony, the jury may well have had the impression that "'defense counsel was engaged

in a speculative and baseless line of attack on the credibility of an apparently blameless witness . . . .'" Id.

In Davis, the trial court refused to allow the defendant to cross-examine the key prosecution witness to show that his probation status was following an adjudication of a juvenile delinquency.  Davis involved an issue regarding the Confrontation Clause and its conflict with a state's asserted interest in preserving the confidentiality of juvenile records. In that case, the defense sought on cross-examination to reveal information regarding the witness's probationary status in order to impeach the witness's testimony on direct that he had never previously been questioned by the police.  The defense also sought to demonstrate possible bias and prejudice, and that the witness may have made his identification under the fear of possible probation revocation.  The Supreme Court held that the jury was entitled to have the benefit of the defense theory in order to make an informed judgment as to the weight to place on the witness's testimony, and that with such a limited cross-examination permitted by the trial court, the jury could have thought defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness. Id. at 317-18.

Davis is distinguishable from the instant case.  First, Dr. Draper was initially presented to the court in support of Petitioner's motion to exclude the testimony of the children.  As shown above, it was Dr. Draper's opinion that the children were not competent to testify.  Second, after the children were questioned regarding their ability to understand the questions presented to them and their understanding of truthfulness and the necessity to

tell the truth, defense counsel cross-examined them not only on inconsistencies between their prior statements and testimony, but also inconsistencies between each child's testimony of events. Although it undoubtedly would have been preferable to Petitioner to use Dr. Draper to "undermine the children's testimony" as he now claims, neither vital information regarding the events nor reasons for potential bias were excluded from the jury.

Petitioner has failed to demonstrate the exclusion of these witnesses rendered his trial so fundamentally unfair as to constitute a denial of a fundamental constitutional right. Petitioner has also not demonstrated that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or that the state court's determination of fact was unreasonable in light of the evidence presented at trial. Accordingly, Petitioner's eighth ground for relief is denied in its entirety.

### 9.      Ground 9:  Denial of Conflict-Free Representation.

In his ninth ground for relief, Petitioner contends the continued representation of Bertha Jean Coffman by her attorney after the dissolution of the joint defense agreement denied him conflict-free representation.  (Pet. at 78-87.)  Respondent responds that this specific claim is unexhausted and procedurally barred from habeas review.

After the preliminary hearing, Petitioner and Ms. Coffman entered into a joint defense agreement that lasted almost a year.  As asserted by Petitioner, both counsel met with each client during this time and each party and their attorneys participated in joint strategy meetings.  In July of 1997, Ms. Coffman requested severance of her case from Petitioner's. She later entered pleas to all of the charges brought against her.  Robert Perrine, Ms.

Coffman's attorney, continually represented her throughout her case, including after the dissolution of the joint defense arrangement and during the *ex parte* hearing on the severance motion, her testimony in Petitioner's trial, and at her sentencing hearing.[22]  Petitioner asserts Mr. Perrine advised Ms. Coffman not to exercise her right against self-incrimination, even though he knew her testimony would not be to Petitioner's benefit.  He claims Mr. Perrine's "continued representation of Ms. Coffman after the joint defense agreement was breached denied Mr. Gilson conflict free representation" and asserts that, as a "former client," Mr. Perrine owed him a duty of loyalty.  Petitioner further claims he was denied the effective assistance of appellate counsel for the failure to raise this conflict claim.  (Pet. at 81-82.)

Respondent does not address the merits of Petitioner's claims.  Instead, Respondent asserts that the claim of ineffective assistance of appellate counsel raised on post-conviction pertained to a failure to adequately investigate the circumstances surrounding the guilty plea of Bertha Coffman, and that Petitioner never raised a claim that he was denied the assistance of conflict-free trial counsel.  Respondent acknowledges that post-conviction counsel discussed the issue, but states that it was not the basis of the claim presented.  Accordingly, Respondent argues that the instant claim is unexhausted and is procedurally barred.

Respondent is correct that the majority of Petitioner's post-conviction claim of ineffective assistance of appellate counsel pertained to allegations of failure to investigate what Petitioner repeatedly referred to in the state court as the "'blind' plea" – inferring a

---

[22]  Ms. Coffman's sentencing hearing was delayed until after Petitioner's trial.

secret deal between the State, the court, Mr. Perrine, and Ms. Coffman regarding her plea to the charges and her subsequent sentencing.   Respondent is incorrect, however, that Petitioner's claim of conflict-free counsel was not raised on post-conviction.   Specifically, Petitioner asserted on post-conviction:

> When Mr. Perrine orchestrated the deal in which Coffman agreed to plead guilty, he broke his duty of loyalty to Mr. Gilson and set up a direct conflict of interest with him.   Perrine knew that the plea would lead to Coffman testifying against Mr. Gilson at trial.   In fact, she testified against him immediately at the original plea hearing.   Perrine thus set the stage to implicate his own client in the murder of Shane.

> One who shows a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.   See Holloway v. Arkansas, 435 U.S., at 487-491, 98 S.Ct., at 1180-1182.   Similarly, in Cuyler v. Sullivan, 446 U.S., at 345-350, 100 S.Ct., at 1716-1719, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest.

> The conclusion follows inescapably that Mr. Gilson was denied his due process rights under the Sixth and Fourteenth Amendments by the plea.

Application for Post-Conviction Relief - Death Penalty, p.10.

In Picard v. Connor, 404 U.S. 270 (1971), the Supreme Court addressed the meaning of the exhaustion requirement and held that the requirement was satisfied once the "substance of a federal habeas corpus claim" had been presented to the state court.   Id. at 278. The Court stated it was not required that the defendant must cite "book and verse on the federal constitution."   Id. at 278 (quotation and citation omitted).   Rather, it is only necessary that the federal claim be "fairly presented" to the state court in order that it might have the first opportunity to hear the claim.   Id. at 275-76.

In the instant case, Petitioner afforded the OCCA the opportunity to hear his claim of the denial of conflict-free counsel, citing for support to the U.S. Constitution and to Supreme Court cases. The OCCA did not, however, address this claim in its *Opinion Denying Application for Post-Conviction Relief, Evidentiary Hearing and Discovery*, despite the fact that it had the opportunity to do so. Accordingly, the Court will review Petitioner's exhausted claim de novo.

In the instant case, the Court must look to the merits of the underlying claim in order to determine if appellate counsel was ineffective for failing to raise it on direct appeal. For support of his conflict of interest claim, Petitioner relies on the Oklahoma Rules of Professional Conduct, Rule 1.9 - Conflict of Interest: Former Client. Pertinent portions of that rule state:

> (a)     A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

> * * *

> (c)     A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

> > (1)     use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or when the information has been generally known; or

> > (2)     reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.

66

Petitioner states that an attorney-client relationship existed between him and Mr. Perrine, "just as there was an attorney client relationship between Ms. Coffman and Ms. Maddox," subjecting Mr. Perrine to "an ethical obligation to preserve confidential communications." (Pet. at 84.) Petitioner does not, however, detail what confidential communications Ms. Coffman's attorney failed to preserve. Instead, he contends Mr. Perrine's continued representation of Ms. Coffman, and his advice to her to waive her privilege against self-incrimination and testify, was contrary to Petitioner's interests and created a conflict between Petitioner and Mr. Perrine. This claim can be distinguished from the previous claim raised by Petitioner regarding defense counsel's attempts to have Deborah Maddox testify to rebut Ms. Coffman's trial testimony. Defense counsel attempted to call Ms. Maddox to testify in an effort to contradict Ms. Coffman by divulging actual confidential communications made during the time the joint defense agreement was in effect. The situation involving Ms. Maddox involved privileged communications made during the joint defense effort, not an actual attorney-client relationship.

Although a joint defense effort existed between the parties and their attorneys,[23] and some confidential information was exchanged during that time, Mr. Perrine did not represent Petitioner and Ms. Maddox did not represent Ms. Coffman. Any actual attorney-client relationship between Petitioner and Mr. Perrine would, therefore, necessarily have to be

---

[23] "Shortly after the preliminary hearing for our clients ended in June 1996, Ms. Maddox and I entered into a joint defense agreement. Although this agreement was not in writing, it was understood that Ms. Maddox and I would combine our efforts and resources to present a unified defense against the charges at trial." (See Resp., ex. B, Affidavit of Robert G. Perrine, attached to Petitioner's *Application for Post-Conviction Relief - Death Penalty*, Appendix VI, ¶ 3.)

implied.  The First Circuit has held that to find an implied relationship, more is required than an individual's subjective belief that the person with whom he is dealing has become his lawyer.  R.I. Depositors Economic Protection Corp. v. Hayes, 64 F.3d 22, 27 (1st Cir. 1995). "Rather, if such a belief is 'to form a foundation for the implication of a relationship of trust and confidence, it must be objectively reasonable under the totality of the circumstances.'" Id., quoting Sheinkopf v. Stone, 927 F.2d 1259, 1260 (1st Cir. 1991).

Although it is reasonable for Petitioner to expect that his conversations with counsel during the joint defense efforts would be, and remain, privileged, it is not objectively reasonable for Petitioner to believe that Mr. Perrine was his attorney, representing his interests above those of Ms. Coffman.  Although the attorneys originally agreed to join efforts in defense of the charges brought against their clients, Petitioner and Ms. Coffman were always represented by their own separate attorneys, both during the time of the joint defense effort and thereafter.  Petitioner has not demonstrated or even alleged any belief that he considered Mr. Perrine his attorney at any time, during or after the severance of the case from Ms. Coffman, other than to allege that a conflict was created by Mr. Perrine's continued representation of Ms. Coffman in violation of the rules of professional conduct.  Under the totality of the circumstances, no attorney-client relationship existed between Petitioner and Mr. Perrine.

Even were an attorney-client relationship to be implied, Petitioner has not demonstrated that a conflict existed, much less one rendering his trial fundamentally unfair.

> The standard by which an asserted conflict of interest claim is measured is set forth in <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333. <u>Cuyler</u> held that a defendant who claims a violation of the Sixth Amendment, yet raised no objection at trial, must demonstrate that an "actual conflict of interest adversely affected his lawyer's performance." <u>Id.</u> at 348, 100 S.Ct. at 1718. Thus the "possibility" of conflict alone is "insufficient to impugn a criminal conviction." <u>Id.</u> at 350, 100 S.Ct. at 1719. The question under <u>Cuyler</u> is (1) whether there existed actual conflict; and (2) whether it had an adverse impact on the attorney's performance.

<u>United States v. Gallegos</u>, 39 F.3d 276, 278 (10th Cir. 1994). A violation of the Rules of Professional Conduct "will not in itself constitute a constitutional violation under <u>Cuyler</u> and related cases. These require that an 'actual' conflict must be established . . . ." <u>Id.</u> at 279.

Petitioner has failed to demonstrate that a conflict was created by Mr. Perrine's continued representation of Bertha Coffman rendering his trial fundamentally unfair. He has also failed to demonstrate that any confidential communications between him and Mr. Perrine were revealed through the continued representation of Ms. Coffman or through Mr. Perrine's counseling of her regarding her testimony and her plea. "Petitioner's ineffective assistance of appellate counsel claim is governed by the familiar standards of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." <u>Smallwood v. Gibson</u>, 191 F.3d 1257, 1269 (10th Cir. 1999). As Petitioner's underlying claim of conflict is without merit, Petitioner cannot overcome the strong presumption that appellate counsel's performance fell within the wide range of reasonable professional assistance. <u>Strickland</u>, 466 U.S. at 688. Accordingly, Petitioner's ninth ground for relief is denied.

### 10.      Ground 10:  Ineffective Assistance of Trial Counsel.

In his tenth ground for relief, Petitioner claims the "failure" of trial counsel at both stages of trial denied him the effective assistance of counsel guaranteed by the Sixth, Eighth and Fourteenth Amendments.  (Pet. at 88-94.)  Petitioner claims trial counsel was ineffective for failing to fully investigate and utilize, during both stages of trial, information pertaining to brain damage he sustained from an automobile accident in 1993.  He claims his trial attorneys became aware of the damage from hospital documentation contained in his file and given to them by Petitioner's first lawyer, but neither understood the information nor continued the investigation.  He further argues that the failure to present this evidence to the jury in either stage of the trial cannot be said to be a strategic decision.

Petitioner sought an evidentiary hearing on this issue in an application to the OCCA filed with his direct appeal.   Attached to the application were twelve (12) affidavits pertaining to the information in his case file, medical information regarding his injuries from the automobile accident, and opinions and observations by individuals familiar with Petitioner both before and after his accident.  Upon review of the application, affidavits and record, the OCCA determined:

> Upon review of the affidavits, we find trial counsel was aware of the automobile accident and any personality changes in [Gilson] since the accident.  However, the record reflects that with that knowledge, counsel chose a defense of actual innocence, not one of diminished capacity.  That strategic choice is not indicative of deficient performance as a defense of actual innocence was reasonable based upon information provided to counsel by [Gilson]'s family and friends.

"[A]n attorney who makes a strategic choice to channel his investigation into fewer than all plausible lines of defense upon which he bases his strategy are reasonable and his choices on the basis of those assumptions are reasonable . . . ,"  An attorney's decision not to interview witnesses and to rely on other sources of information, if made in the exercise of professional judgment, is not ineffective counsel.

Boltz v. State, 806 P.2d 1117, 1126 (Okl.Cr.1991), cert. denied, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991), quoting United States v. Glick, 710 F.2d 639, 644 (10th. Cir. 1983).

Here, [Gilson] told police he never abused Shane, but merely assisted in the decision concerning what to do with the body and the removal of the body.  Further, he said he never abused any of the other children, that it was Bertha Coffman who abused the children.  [Gilson]'s mother and step-father testified they never saw [Gilson] abuse the children and that the children appeared to be fond of [Gilson].  Based upon this evidence, it was a reasonable decision based upon their professional judgment for defense counsel to focus on Bertha Coffman as the actual perpetrator and pursue a defense of actual innocence on [Gilson]'s part.  That the strategy proved unsuccessful is not grounds for branding counsel ineffective.  Absent a showing of incompetence, [Gilson] is bound by the decisions of his counsel and mistakes in tactic and trial strategy do not provide grounds for subsequent attack.  Davis v. State, 759 P.2d 1033, 1036 (Okl. Cr. 1988).  To have also raised any type of mental disorder defense would have been inconsistent with a defense of actual innocence and would have considerably weakened both defenses.  Counsel's decision in this case was reasonable trial strategy, which we will not second guess on appeal.  Bernay v. State, 989 P.2d 998, 1015 (Okl. Cr. 1999).

Further, counsel was not ineffective for failing to present evidence of the injury during second stage.  The record shows the second stage defense focused on [Gilson] being a productive and contributing member of society therefore, he deserved a punishment less than death.  This included evidence of his lack of any prior violent conduct and his skills and ability to maintain employment.  While evidence of [Gilson]'s mental condition and his inability to control his "explosive behavior" may have had some mitigating effect, this evidence could be a two-edged sword.  Evidence that [Gilson] had poor control over his behavior had the potential of proving [Gilson] was a threat to society, including prison society, and could indicate a propensity for future violence.  Such evidence would have been contradictory to mitigating evidence of

[Gilson]'s lack of culpability and lack of violent conduct.  Counsel's strategic decision to pursue a second stage defense that [Gilson] was less culpable than Coffman, and highlight the positive traits of his character instead of focusing on any mental problems he might have was well within the range of professional reasonable judgment.

While [Gilson] has provided a great deal of information in his affidavits, we find he has failed to set forth sufficient evidence to warrant an evidentiary hearing.  He has failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to utilize the complained-of evidence.  Short[ v. State], 980 P.2d [1081] at 1109 [1999].  Accordingly, we decline to grant [Gilson]'s application for an evidentiary hearing.

Gilson, 2000 OK CR 14, ¶ 173-176, 8 P.3d at 928-29.

Petitioner contends the OCCA's determination is contrary to federal law and is an unreasonable application of the law to the facts.  He requests an evidentiary hearing to allow full development of the facts to support his claim.  Initially, it should be noted that although the OCCA did not cite to Strickland, 466 U.S. 668, in this portion of its opinion, it did rely on Boltz v. Oklahoma, 1991 OK CR 1, 806 P.2d 1117, a state case applying the Strickland standard to an ineffective assistance of counsel claim.  The OCCA does not need to cite to specific Supreme Court precedents, so long as its reasoning does not contradict them.  Parker v. Scott, 394 F.3d 1302, 1320 (10th Cir. 2005).[24]

As the OCCA applied clearly established federal law to Petitioner's ineffective assistance of counsel claim, habeas relief is only possible if the OCCA's application was

---

[24] Although the OCCA referenced a clear and convincing standard, such reference pertained to whether Petitioner should be granted an evidentiary hearing on direct appeal and not whether he had met the Strickland standard for an ineffective assistance of counsel claim.  Id.

objectively unreasonable in light of Supreme Court precedent.  Id.  To prevail on a claim of ineffective assistance of counsel under the Sixth Amendment, Petitioner must first show that his counsel "committed serious errors in light of 'prevailing professional norms'" in that the representation fell below an objective standard of reasonableness.  See Strickland v. Washington, 466 U.S. 668, 688 (1984).  In so doing, Petitioner must overcome the "strong presumption" that his counsel's conduct fell within the "wide range of reasonable professional assistance" that "'might be considered sound trial strategy,'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  He must, in other words, overcome the presumption that his counsel's conduct was constitutionally effective. United States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1993).  A claim of ineffective assistance "must be reviewed from the perspective of counsel at the time," Porter v. Singletary, 14 F.3d 554, 558 (11th Cir. 1994), and may not be predicated on "the distorting effects of hindsight."  Strickland, 466 U.S. at 689.

If constitutionally deficient performance is shown, Petitioner must then demonstrate that "there is a 'reasonable probability' that the outcome would have been different had those errors not occurred."  Haddock, 12 F.3d at 955; citing Strickland, 466 U.S. at 688, 694; Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).  In the specific context of a challenge to a death sentence, the prejudice component of Strickland focuses on whether "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Strickland, 466 U.S. at 695; quoted in Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir. 1992).  Petitioner carries the burden of establishing both that the alleged

deficiencies unreasonably fell beneath prevailing norms of professional conduct and that such deficient performance prejudiced his defense.  Strickland, 466 U.S. at 686; Yarrington v. Davies, 992 F.2d 1077, 1079 (10th Cir. 1993).  In essence, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Strickland, 466 U.S. at 686.

The Court does not find the OCCA's determination to be unreasonable.  The OCCA, in addition to considering the affidavits submitted in support of Petitioner's application for an evidentiary hearing, also considered the testimony and evidence presented at trial.  The state court found it to be a reasonable decision for counsel to focus on Bertha Coffman and to present a defense of actual innocence, based on Petitioner's and other witnesses' statements denying that he had ever abused the children.  The reasonableness of this decision could also be further supported by the history of the abuse and neglect of the children that occurred prior to Petitioner's involvement with the Coffman family.

For the reasons stated by the OCCA, it was also reasonable trial strategy to not present evidence of mental injury, personality changes and explosive behavior in the second stage of trial.  Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002), relied upon by Petitioner to support his claim for an evidentiary hearing and habeas relief, can be distinguished from the instant case.  In Sallahdin, the petitioner first raised his claim of ineffective assistance of counsel on post-conviction.  The OCCA determined that the claim was procedurally barred and did not consider it on the merits.  On habeas review, the District Court resolved the claim

on the merits, and the Tenth Circuit reviewed the court's determination and conclusions of law *de novo*.  The Tenth Circuit found that counsel's failure to present a defense of "Steroid Rage Syndrome" during the guilt phase of trial was neither deficient performance nor prejudicial.  The Tenth Circuit found that the steroid use evidence "would not have excused Sallahdin's commission of murder, or lessened his culpability."  Id. at 1237.  As to the sentencing phase, the Tenth Circuit reversed and remanded the case for an evidentiary hearing.  The Court stated that because the record on appeal was inadequate to properly conduct an inquiry into counsel's second stage performance, it was necessary to remand the case for an evidentiary hearing as to counsel's reasons for not presenting the steroid related evidence as a mitigating factor.  The Tenth Circuit stated:

> In addition to mitigating Sallahdin's culpability in the crime, Dr. Pope's testimony could have specifically helped to rebut one of the two remaining aggravators found by the jury:  that there was a probability Sallahdin "would commit criminal acts of violence that would constitute a continuing threat to society."  Okla. Stat. tit. 21, § 701.12.  If the jury believed Dr. Pope, it could well have rejected the future threat argument by concluding that Sallahdin's crimes were an aberration in the overall context of his life that could be explained by his use of or withdrawal from steroids.  Once the effects of the steroids passed from Sallahdin's system, he arguably would no longer have represented a threat to his community.  Assuming the jury determined that Sallahdin did not represent a continuing threat, the overall balance of aggravating and mitigating factors would have been substantially altered, leaving the jury to weigh Sallahdin's mitigating evidence against a single aggravating factor.

Id. at 1239-40.

In the instant case, the OCCA made a determination based on clearly established federal law as determined by the Supreme Court.  Petitioner bears the burden to demonstrate

that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.  Petitioner has failed to meet that burden.  It is not unreasonable to determine that counsel's decision was strategic.  First degree child abuse murder is a general intent crime in Oklahoma.  See Fairchild v. Oklahoma, 1999 OK CR 49, 998 P.2d 611.  As detailed more specifically in addressing Petitioner's other claims, first degree child abuse murder can be committed by actually committing the abuse or by permitting the abuse that leads to the death of a minor child. Evidence of mental injury causing explosive outbursts would not have lessened Petitioner's culpability for the crime.  Additionally, in contrast to Sallahdin, Petitioner's asserted mental injury and resulting personality changes are not temporary or an "aberration in the overall context of his life."  From review of the affidavits, Petitioner's personality changes and explosive outbursts are permanent, and would support, rather than mitigate, a finding of Petitioner representing a continuing threat to society.[25]  These reasons, together with Petitioner's statements of innocence, support a strategic reason for not presenting evidence of mental injury, and support a finding that the OCCA's determination was not unreasonable. Petitioner has not demonstrated the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, Petitioner's tenth ground for relief is denied.

---

[25] The jury found the existence of two aggravating factors:  the murder was especially heinous, atrocious or cruel, and that Petitioner represented a continuing threat to society.

11.     **Ground 11:  Challenge to Aggravating Circumstances as Vague and Unsupported by the Evidence.**

In his eleventh ground for relief, Petitioner contends the heinous, atrocious, or cruel aggravating circumstance and the continuing threat aggravating circumstance are unconstitutionally vague and were not supported by sufficient evidence to prove their existence beyond a reasonable doubt.   Respondent responds that the aggravating circumstances are constitutional and supported by the evidence, and that the OCCA's determination was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court.

a.      **Vagueness of Heinous, Atrocious or Cruel Aggravator**

On appeal, the OCCA rejected Petitioner's challenge of the especially heinous, atrocious, or cruel aggravating circumstance as being unconstitutionally vague.  The OCCA noted that the jury had been given the uniform instruction on this aggravating circumstance, and reiterated that this instruction had been repeatedly upheld.  Gilson, 2000 OK CR 14, ¶¶ 163-164, 8 P.3d at 925-26.  Petitioner argues the instruction was not properly defined or narrowed because the jury was not informed that undue conscious physical or mental suffering was required to show serious physical abuse.  The instruction given in Petitioner's case is identical to the instruction challenged in LaFevers v. Gibson, 182 F.3d 705 (10th Cir. 1999), and found to be constitutional.  Id. at 720-21.  The Tenth Circuit has repeatedly upheld Oklahoma's especially heinous, atrocious, or cruel aggravating circumstance against vagueness challenges.  See Miller v. Mullin, 354 F.3d 1288, 1300 (10th Cir. 2004), cert.

denied, 543 U.S. 1154 (2005); Workman v. Mullin, 342 F.3d 1100, 1115 (10th Cir. 2003);

Romano v. Gibson, 239 F.3d 1156, 1176 (10th Cir. 2001); Thomas v. Gibson, 218 F.3d 1213,

1226-29 (10th Cir. 2000); Medlock v. Ward, 200 F.3d 1314, 1319 (10th Cir. 2000); Moore

v. Gibson, 195 F.3d 1152, 1175-76 (10th Cir. 1999); Smallwood v. Gibson, 191 F.3d 1257,

1274 (10th Cir. 1999); Hooks v. Ward, 184 F.3d 1206, 1239-40 (10th Cir. 1999); LaFevers

v. Gibson, 182 F.3d 705, 721; Duvall v. Reynolds, 139 F.3d 768, 793 (10th Cir. 1998);

Nguyen v. Reynolds, 131 F.3d 1340, 1352-54 (10th Cir. 1997).

The Tenth Circuit's precedent forecloses Petitioner's argument on this issue.

Additionally, Petitioner has failed to demonstrate that the OCCA's resolution of this claim

was contrary to, or involved an unreasonable application of, clearly established federal law,

as determined by the Supreme Court of the United States.

### b.    Vagueness of the Continuing Threat Aggravator

Petitioner's vagueness challenge to the continuing threat to society aggravating

circumstance was also rejected by the OCCA.  The OCCA cited to a previous state case in

which the same challenge had previously been presented and rejected.  The OCCA found that

when the aggravating circumstance was read in its entirety, it was clear the State had the

burden of proving the defendant would likely continue criminal conduct in the future that

would constitute a continuing threat to society.  Accordingly, it determined it would not

revisit the issue.  Gilson, 2000 OK CR 14, ¶ 162, 8 P.3d at 925.

In Nguyen v. Reynolds, 131 F.3d 1340 (10th Cir. 1997), the Tenth Circuit found

Oklahoma's continuing threat aggravating circumstance was "nearly identical" to the

aggravating factor used by Texas and approved by the Supreme Court in Jurek v. Texas, 428

U.S. 262, 274-75 (1976).  In construing the constitutionality of Oklahoma's continuing threat

aggravating circumstance, the Tenth Circuit held:

> [t]he fact that Oklahoma chooses to grant a sentencing jury wide discretion to make a predictive judgment about a defendant's probable future conduct does not render the sentencing scheme in general, or the continuing threat factor in particular, unconstitutional.   Although this predictive judgment is not susceptible of "mathematical precision," we do not believe it is so vague as to create an unacceptable risk of randomness.  To the contrary, we believe the question of whether a defendant is likely to commit future acts of violence has a "common-sense core of meaning" that criminal juries are fully capable of understanding.

Nguyen, 131 F.3d at 1354.

Both the Tenth Circuit and the United States Supreme Court have found this

aggravating circumstance to pass constitutional muster.  See Johnson v. Texas, 509 U.S. 350

(1993) (Texas' capital sentencing scheme based on continuing threat to society does not

violate Eighth Amendment); Revilla v. Gibson, 283 F.3d 1203, 1218 (10th Cir. 2002);

Sallahdin, 275 F.3d at 1232; Medlock, 200 F.3d at 1319; Trice v. Ward, 196 F.3d 1151,

1172-73 (10th Cir. 1999); Moore, 195 F.3d at 1177-78; Hooks, 184 F.3d at 1238-39; Ross

v. Ward, 165 F.3d 793, 800 (10th Cir. 1999); Castro v. Ward, 138 F.3d 810, 816 (10th Cir.

1998).  As with Petitioner's previous vagueness argument, the Tenth Circuit's precedent

precludes this claim.  Petitioner does not make any argument which compels or permits this

Court to disregard this binding precedent.  See United States v. Foster, 104 F.3d 1228 (10th

Cir. 1997).

### c.      Sufficiency of the Evidence

In a federal habeas proceeding, the appropriate inquiry into a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Romano, 239 F.3d at 1176. The inquiry is based upon the entire record and the reasoning process actually used by the trier of fact, whether known or not, is not considered. Jackson, 442 U.S. at 319 n.13 ("The question whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was actually reached."). The Court must accept the jury's determination as long as it is within the bounds of reason. Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir. 1996).

The AEDPA additionally directs that, where the state court has already addressed the claim, this Court's review is further limited. See Valdez v. Ward, 219 F.3d 1222, 1237 (10th Cir. 2000). In that instance, the Court's review is governed by 28 U.S.C. § 2254(d).[26]

---

[26]      "Our case law is unclear whether a sufficiency of the evidence claim presents a question of law that is reviewed under § 2254(d)(1) or a question of fact reviewable under § 2254(d)(2). See Turrentine v. Mullin, 390 F.3d 1181, 1197 (10th Cir. 2004) [cert. denied, ___ U.S. ___, 125 S.Ct. 2544 (2005)]; Hogan v. Gibson, 197 F.3d 1297, 1306 (10th Cir. 1999); Moore v. Gibson, 195 F.3d 1152, 1176 (10th Cir. 1999). Nonetheless, we need not decide this issue because the OCCA's determination is neither contrary to clearly established federal law nor based on an unreasonable determination of the facts."

 Boltz v. Mullin, 415 F.3d 1215, 1230 (10th Cir. 2005), cert. denied, ___ U.S. ___, 126 S.Ct. 1631 (2006).

###### i.        Heinous, Atrocious, or Cruel Aggravator

Petitioner claims the evidence was insufficient for the jury to find, and that the State failed to prove beyond a reasonable doubt, that he had murdered Shane Coffman in an especially heinous, atrocious or cruel manner.  He asserts the State failed to prove beyond a reasonable doubt that he had murdered Shane at all, and that Oklahoma has held that conduct of another person may not be considered when determining the sufficiency of the evidence underlying this aggravating circumstance.  On appeal, the OCCA found the evidence sufficient to support the aggravator.  The court further distinguished the state cases relied on by Petitioner and determined that regardless whether it was Petitioner or Coffman who inflicted the fatal blows, Petitioner's involvement was substantial, and the vicious beatings and abuse Shane Coffman suffered "either from or because of" Petitioner supported the conclusion that his death was preceded by serious physical abuse.  Gilson, 2000 OK CR 14, ¶ 156, 8 P.3d at 924.

Evidence was presented at trial of a horrific number of broken and fractured bones on the skeletal remains of Shane Coffman, suffered and incurred immediately prior to or at the time of his death.  Shane's siblings testified about Petitioner hitting Shane with a board as punishment and later hearing Shane's screams when Petitioner and Bertha Coffman took him outside.  They related how, when he was brought back inside the trailer, Shane's arms were swollen, he had a soft spot on his head, and he was experiencing difficulty breathing.

Viewing this and other evidence in the light most favorable to the prosecution, the jury rationally could have found beyond a reasonable doubt that Shane Coffman suffered conscious physical and mental pain and suffering prior to his death, and that his murder was especially heinous, atrocious, or cruel.

### d.    Continuing Threat Aggravator

The OCCA similarly found the evidence sufficient to support the continuing threat aggravating factor, noting that the callousness of the murder may also be considered as supporting evidence. Gilson, 2000 OK CR 14, ¶ 157, 8 P.3d at 925. The OCCA reasoned that Petitioner's disregard for Shane Coffman's screams and cries as he either abused him or allowed him to be abused showed the callous nature of the crime. Id. This abuse, when considered with the escalating abuse of Shane's siblings, Tia and Isaac, "clearly shows a pattern of criminal conduct which supports a finding that [Gilson] posed a continuing threat to society." Id., 2000 OK CR 14, ¶ 161, 8 P.3d at 925. Contrary to Petitioner's assertion, this evidence, taken in the light most favorable to the prosecution, supports a finding that any rational trier of fact could have found the essential elements of the aggravating circumstance beyond a reasonable doubt.

### e.    Conclusion

A reasonable jury could find beyond a reasonable doubt the essential elements supporting the heinous, atrocious or cruel and the continuing threat aggravating factors. Petitioner has not demonstrated the OCCA's determination was either contrary to, or an

unreasonable application of, <u>Jackson</u> or other clearly established federal law in upholding the jury's finding of these aggravating circumstances.

Additionally, constitutionally-based vagueness challenges have been consistently rejected by the Tenth Circuit and these rulings are binding on this Court.  Petitioner has not made any argument to compel or permit this Court to disregard this binding precedent. Petitioner has failed to demonstrate that the OCCA's resolution of these claims was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C.A. §2254(d)(1).  Therefore, habeas relief on the claims contained in Petitioner's eleventh ground for relief is denied.

**IV.    Petitioner's Request for an Evidentiary Hearing.**

Petitioner requests an evidentiary hearing regarding his eighth, ninth, and tenth grounds for relief.  Additionally, Petitioner generally requests an evidentiary hearing "as to the petition as a whole and particularly as to any issues involving facts not apparent from the existing record and to any issues involving facts disputed by the State."  (Pet. at 105.)  The Court has considered Petitioner's specific requests and, based on the reasons set forth in this opinion, has determined an evidentiary hearing regarding his eighth, ninth, and tenth grounds for relief to be neither warranted nor required.

The first step in deciding whether an evidentiary hearing is warranted is to determine whether Petitioner failed "to develop the factual basis" of his claims in state court.  <u>Williams v. Taylor</u>, 529 U.S. 420 (2000); <u>Miller v. Champion</u>, 161 F.3d 1249, 1253 (10th Cir. 1998); 28 U.S.C.A. § 2254(e)(2).  According to <u>Miller</u>, if "a habeas petitioner has diligently sought

to develop the factual basis underlying his habeas petition, but a state court has prevented him from doing so, § 2254(e)(2) does not apply." Miller, 161 F.3d at 1253.  In other words, if a petitioner diligently sought an evidentiary hearing in state court and his request was denied, the petitioner can not be deemed to have "failed to develop the factual basis" of the claims. Miller, 161 F.3d at 1253.

The Court cannot determine from Petitioner's general request for an evidentiary hearing whether Petitioner has or has not failed to develop the factual basis of his claims in state court.  Assuming, however, Petitioner did not fail to develop the claims, his request for an evidentiary hearing must be governed by pre-AEDPA standards. Id. at 1249, 1253 (10th Cir. 1998).  Under the pre-AEDPA standards, Petitioner "is entitled to receive an evidentiary hearing so long as his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief." Id. (citing Medina v. Barnes, 71 F.3d 363, 366 (10th Cir. 1995)).

In his general request, Petitioner does not identify what facts he alleges might be developed that would entitle him to habeas relief, and which issues require additional factual support.  Without such an indication, the Court cannot determine whether Petitioner's allegations are controverted by the existing factual record.  Absent specific allegations, Petitioner's request amounts to mere speculation.  Speculation alone is insufficient to warrant or require an evidentiary hearing.  Accordingly, Petitioner's request for an evidentiary hearing is denied.

**V.      Conclusion**.

After a complete review of the transcripts, trial record, appellate record, record on post-conviction, and briefs filed by Petitioner and Respondent, and the applicable law, the Court finds Petitioner's request for relief in his *Petition For a Writ of Habeas Corpus by a Person in State Custody* (Dkt. No. 13) to be without merit.  ACCORDINGLY, habeas relief on all grounds is **DENIED**.  A judgment will enter accordingly.

IT IS SO ORDERED this 9th day of August, 2006.


ROBIN J. CAUTHRON
United States District Judge